**UNITED STATES, Plaintiff, Appellee,**

v.

**U.S. CURRENCY, $81,000.00, etc., et al., Defendants, Appellees.**

**John P. Bulger, Claimant, Appellant.**

No. 98–1839.

United States Court of Appeals, First Circuit.

Heard June 10, 1999.

Decided Aug. 19, 1999.

George F. Gormley, with whom George F. Gormley, P.C. and Kern W. Cleven were on brief, for appellant.

Richard L. Hoffman, Assistant United States Attorney, with whom Donald K. Stern, United States Attorney, was on brief, for appellee United States.

Before TORRUELLA, Chief Judge, CAMPBELL, Senior Circuit Judge, and SELYA, Circuit Judge.

TORRUELLA, Chief Judge.

This is an *in rem* action, brought by the United States for forfeiture of money owned, at least in part, by James "Whitey" Bulger. The United States seeks forfeiture of approximately $200,000 that it claims was derived from Whitey Bulger's illegal extortion, racketeering, and money laundering activities. Whitey Bulger, a fugitive since January 1995, has not appeared to file a claim to the property. The only claimant is his brother, John Bulger. The United States moved to dismiss John Bulger's claim, arguing that he has no actual ownership interest in the defendant property. The district court allowed the motion to dismiss, and subsequently ordered forfeiture of the property at issue. For the reasons stated below, we **VACATE** the judgment entered by the district court.

## BACKGROUND

In its pleadings and other papers, the government alleges that Whitey Bulger, together with others, had been actively involved in criminal activity for a period of some thirty years preceding the filing of the verified complaint in this action. The government asserts that, over this extend-

ed period of time, Whitey Bulger "directly or indirectly received and amassed hundreds of thousands, and probably millions, of dollars ... from ... illegal revenue."

Details were given regarding two alleged criminal episodes, one involving Whitey Bulger's purportedly extortionate purchase and subsequent sale of a liquor store, the other involving his purchase, together with others, of a share in a winning Massachusetts lottery ticket.

The government contends that between January and May of 1984, Whitey Bulger, together with others and by threats of violence, purchased at a favorable price a retail liquor store then known as Stippo's Liquor Mart and the real property on which it was situated, at 295 Old Colony Avenue in South Boston. Public documents show that the property was purchased by Kevin Weeks, said to be an associate of Whitey Bulger. Two years later, in May of 1986, the real property was resold to Weeks, Whitey Bulger, and another person. A few days after that, South Boston Liquor Mart, Inc., was established to do business at that location.

At some point between 1988 and 1990, Whitey Bulger approached his brother John and asked whether he would be a cosignatory with him on a bank account that he proposed to establish. John agreed, signed some papers, and the account was opened as South Boston Savings Bank Account ("SBSB"), No. 02–44–255305, in the names of James J. Bulger and John P. Bulger. Thereafter, statements began arriving at John Bulger's home address. John Bulger did not make deposits to the account, does not claim any knowledge of the source of or reason for deposits to the account, and has treated its contents as property of his brother James. Nonetheless, the checkbook was kept at John Bulger's house.

On December 9, 1989, Whitey Bulger, Kevin Weeks, and the other record owner of the real property at 295 Old Colony Avenue sold their interests to Whitey Bulger for a total of $40,000. That same day, an organization known as Shamrock Realty Trust was established, with Weeks and another person named as trustees. Shamrock Realty Trust promptly purchased the Old Colony Avenue property from Whitey Bulger for $400,000, granting a mortgage to Whitey Bulger, with the property as collateral, to secure the purchase price. Shamrock Realty Trust was to make monthly payments to Whitey Bulger in the amount of $4,672.90.

In December 1990 or January 1991, a "Mass Millions" state lottery entry was purchased by Michael Linskey and registered in his name. Under this arrangement, the registrant automatically participates in drawings over the course of the following year. Michael Linskey's entry won in July 1991, and was worth approximately $14.3 million (prior to taxes), payable in annual installments over a twenty-year period beginning in July 1991 and continuing through July 2010. Michael Linskey's brother, Patrick Linskey, is also alleged to be an associate of Whitey Bulger. Within a few days, and before the first disbursement of winnings, papers were provided to the state lottery commission indicating that Whitey Bulger, Patrick Linskey, and Kevin Weeks were by prior agreement entitled to equal parts of a one-half interest in the winnings (i.e., one-sixth each), the other half belonging to the previously registered winner, Michael Linskey. At the same time, arrangements were made with the South Boston Savings Bank to assist in apportioning and distributing the winnings among the several individuals mentioned.

According to information provided by the government, shares of the winning entry had been purchased by Whitey Bulger, Patrick Linskey, and Kevin Weeks only after the winning drawing. For a lump-sum payment of $700,000, Whitey Bulger is said to have purchased his one-sixth interest in the winnings, amounting to annual payments of $119,408 (prior to taxes) over a period of twenty years. In July of

each year from 1991 through 1994, the total winnings, less taxes, were paid to Michael Linskey. Michael Linskey deposited the winnings in his account at South Boston Savings Bank, whereupon the bank, pursuant to the above agreement, apportioned and distributed the funds, depositing Whitey Bulger's share into the joint checking account he held along with John Bulger. Whitey Bulger's lottery share for 1995 and after has been seized and forfeited in separate proceedings, and is not at issue here.

At some point in 1993, John Bulger withdrew about $13,000 from the joint checking account to purchase a car. He says that he considered this a loan, and that some repayment of this loan had been made by November 1996, primarily by John Bulger periodically placing his own cash into an envelope at his home containing funds intended for Whitey Bulger. John Bulger would also from time to time pay bills for Whitey Bulger using money including cash from this envelope. The envelope and notations on it had apparently been thrown out some time before John Bulger's grand jury testimony in November 1996.

On August 24, August 30, and September 10, 1993, John Bulger made cash withdrawals in the respective amounts of $25,000, $75,000, and $90,000 from the joint checking account. He says that these withdrawals were made at Whitey Bulger's request, and the money was given to Whitey Bulger without any further explanation being given to or requested by John Bulger.

In July 1994, deposits to the joint checking account of after-tax lottery proceeds amounted to $80,003.36. On September 16, 1994, Whitey Bulger wrote a check for $100,000 against the joint checking account described above and deposited it into South Boston Savings Bank Account No. 2–18–17712 in the joint names of James J. Bulger and John Bulger. Prior to its seizure in November 1996, it does not appear that there were any further deposits to the latter account, other than interest in the amount of $7,851.76 earned on the original deposit, nor were there any withdrawals from it. It thus appears that the joint checking account is the sole source of the defendant funds seized from the latter joint passbook savings account. A bank statement dated September 18, 1993, indicates that as of that date the balance in the original joint checking account was $8,572.58.

During the thirty-six months from September 1993 through August 1996, at least twenty-seven deposits of $4,672.90, the amount due monthly under the Old Colony Avenue real estate sale agreement, were made to the original joint checking account.[1] The twenty-seven known deposits would total $126,168.30. If similar deposits were made in each of the five months for which statements were unavailable, an additional $23,364.50 would also have been deposited in amounts suggesting a relationship to the Old Colony Avenue sale.

It appears that neither the government nor John Bulger have been in contact with Whitey Bulger since about December 1994 or January 1995. Whitey Bulger's whereabouts are unknown, and the government regards him as a fugitive from justice. Criminal proceedings are now pending in which Whitey Bulger is a named co-defendant in matters including an alleged RICO conspiracy dating from 1969 to 1995. See United States v. Salemme, No. 94–10287–MLW (D.Mass.).

Both before Whitey Bulger's disappearance and after, John Bulger used funds from the joint checking account to pay bills for Whitey Bulger. It does not appear that Whitey Bulger had to make a specific request for John Bulger to take such actions, and in fact no such instructions appear to have been received from Whitey as to bills paid since his disappearance.

1. For five months in this period, statements could not be found.

Both before and after Whitey Bulger's disappearance in January 1995, John Bulger enjoyed a number of vacations, including a trip to Florida in February and March of 1996 and a cruise to Bermuda in July 1996. Money from the joint checking account helped pay for the two 1996 vacations, and might possibly have helped pay for a vacation John Bulger took to Aruba in late 1994, before Whitey Bulger's disappearance. John Bulger used money withdrawn from the joint checking account for these purposes without specific authorization from Whitey Bulger, solely on the basis that he believed Whitey Bulger would have permitted him to take and use the money with an informal understanding that John would repay it at some later time, if and when he was able to do so. John Bulger did not keep an exact tally of how much money had been "borrowed" in this fashion, but estimates that he owes Whitey about $14,000 to $17,000. John Bulger gave no indication that he believed Whitey Bulger would be concerned about the absence of more precise records or formal lending arrangements, and repeatedly stated that he felt Whitey Bulger would approve of his actions with respect to money taken from the joint checking account.

In July 1995, the government initiated forfeiture proceedings against some of Whitey Bulger's assets, notably his present and future share of the 1991 winning lottery ticket. After learning of this, and motivated by a concern that further forfeiture proceedings might be in the offing, John Bulger made a series of cash withdrawals from the original joint checking account, totaling approximately $130,000. They are as follows: (1) $80,000 on August 3, 1995; (2) $15,000 on May 10, 1996; and (3) $35,000 on August 21, 1996. John Bulger kept this money in his home, or expended it as described below, until it was placed in a safe deposit box.

In August 1995, John Bulger loaned $1,000 of the funds withdrawn from the joint checking account to his and Whitey Bulger's sister, Jean Holland. John Bulger did not know Holland's specific plans for that money, and did not make any formal arrangements for repayment, but decided, without specific instructions from Whitey Bulger, that he would approve of the loan.

Around January or February of 1996, John Bulger gave some $25,000 of the funds withdrawn from the joint checking account in or since August 1995, to Nancy Stanley, daughter of a longtime friend of Whitey Bulger's, as a belated wedding gift. John Bulger did this because he was aware that Whitey Bulger, who was not present at Nancy Stanley's wedding in late 1995, had in the past said that he intended to pay for Stanley's wedding. Thus, John Bulger acted unilaterally, albeit in accordance with what he knew or surmised about Whitey Bulger's wishes and intentions.

Shortly before he gave testimony to a grand jury on two dates in November 1996, John Bulger went to BayBank on Tremont Street in Boston, where he holds safe deposit box No. 03–116–00040 in his name, and deposited approximately $80,000 to $90,000 of the money withdrawn from the joint checking account during the past year and a half there for safekeeping. Thus, the joint checking account is the ultimate source of the defendant funds seized from the safe deposit box.

In his grand jury testimony, John Bulger confirmed so much of the above banking transactions as was within his personal knowledge. He indicated that he was not aware of any regular employment, aside from the liquor store, that his brother, James, had ever had. He did not indicate that he had any personal knowledge of any criminal or unlawful activity on James's part.

In August 1996, the South Boston Savings Bank was acquired by Bank of Boston. The original joint checking account became Bank of Boston savings account No. 645–8450, and the South Boston Sav-

ings Bank account became Bank of Boston account No. 1491–77490. At the time of the seizures in November 1996, the successor to the original joint checking account contained $9,818.60, the other successor account contained $107,851.76, and the safety deposit box in John Bulger's name contained $81,000. The total seized was $198,670.36.

## DISCUSSION

### I. Standard of Review

We review a district court's judgment on the pleadings *de novo,* as if we were considering the government's motion anew. *See International Paper Co. v. Town of Jay,* 928 F.2d 480, 482 (1st Cir. 1991). Like the trial court, we accept the claimant's material allegations as true, and draw all reasonable inferences in favor of the claimant. *See id.* The motion at issue here does not call upon the district court to look to extrinsic matters. *See Collier v. City of Chicopee,* 158 F.3d 601, 603 (1st Cir.1998). We cannot uphold the district court's action "unless it appears beyond doubt that the [claimant] can prove no set of facts in support of his claims which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

### II. Standing

Our evaluation of John Bulger's claim to the property at issue is a two step process. State law determines his ownership interest in the joint account, *see United States v. One Parcel of Real Property, Appurtenances and Improvements Known as 116 Emerson Street Located in the City of Providence, Rhode Island ("116 Emerson Street"),* 942 F.2d 74, 78–79 (1st Cir. 1991) (reviewing claim of ownership under Rhode Island law), but then federal law determines the effect of his ownership interest on his right to bring a claim. *See United States v. National Bank of Commerce,* 472 U.S. 713, 722, 105 S.Ct. 2919, 86 L.Ed.2d 565 (1985).

### A. Massachusetts Law

It is well-established that in a dispute between the holders of a joint account, or one joint holder and the heirs of another, the intent of the depositor determines the parties' actual ownership interests. *See, e.g., Ball v. Forbes,* 314 Mass. 200, 49 N.E.2d 898, 901 (1943). Where the joint account is set up for the convenience of the depositor only, the co-signer on the account does not have an actual ownership interest that she can assert against the depositor. *See Bradford v. Eastman,* 229 Mass. 499, 118 N.E. 879, 879–80 (1918).

As John Bulger correctly contends, however, almost all of the cases the government cites to this effect share one feature conspicuously absent here: they are disputes between the joint owners, or between one owner and the other's heirs, beneficiaries, or assigns, not between one owner and a third party. As against the bank, by contrast, the contract of deposit is conclusive evidence of each party's ownership interest. *See Ball,* 49 N.E.2d at 900 ("the contract of deposit is conclusive as between the parties and the bank"); *Bradford,* 118 N.E. at 879 ("as between the banks and these parties, the banks would be justified in treating the deposits as funds in which the parties had a joint interest"). John Bulger argues that the government's position in this case is more akin to that of a bank—an outsider who must rely on the contract of deposit as proof of each account holder's ownership interest—than to that of a co-signer or a co-signer's heirs and assigns. In his view, only the latter may challenge the "real" ownership.

The government attempts to rebut John Bulger's assertion by citing cases allowing the attachment or taxation of a joint account by a creditor. *See Heffernan v. Wollaston Credit Union,* 30 Mass.App.Ct. 171, 567 N.E.2d 933, 939 (1991). However, these cases do not question or deny the non-debtor account holder's actual ownership interest. They recognize the non-

debtor's rights, but nonetheless allow attachment as a matter of state property law. *See id.* at 938. Further, as the district court noted, the government's citation to *In re Moffitt, Zwerling & Kemler, P.C.,* 875 F.Supp. 1152, 1164 (E.D.Va.1995) (holding that joint bank accounts remain subject to forfeiture), *rev'd in part on other grounds,* 83 F.3d 660 (4th Cir.1996), *cert. denied,* 519 U.S. 1101, 117 S.Ct. 788, 136 L.Ed.2d 730 (1997), is unavailing, because the issue here is not whether the property is immune from forfeiture, but whether John Bulger's legal rights in the account enable him to challenge that forfeiture at all.

The district court concluded that "the government has failed to show that Massachusetts law allows an assessment of 'real' ownership interests in a joint account in a dispute between one of the account holders and a third party who does not raise derivative claims through the other holder." (*Memorandum and Order* at 11.) The district court went on to state that for purposes of this case, it would assume that John Bulger holds legal title to the joint account under state law. (*See id.*)

Our review of the law leads us to believe that we need not merely assume John Bulger's legal title, because it is fact. In *Heffernan,* the Massachusetts Appeals Court stated:

> A party to a Massachusetts joint bank account ... has the right to withdraw all the funds in a joint account, or any portion of them. Unlike a joint tenant of property held in a traditional joint tenancy, therefore, he may effectively exercise control over the entire interest, or any part of it, and divest totally or partially, the interest of the other.

*Heffernan,* 567 N.E.2d at 937; *see* Mass. Gen. Laws ch. 167D, § 5 (Joint Accounts) ("[A]ny part or all of the deposits and interest represented by the joint account may be withdrawn, assigned or transferred in whole or in part by any of the individual parties."). None of the arguments put forth by the government effectively challenges John Bulger's legal title to the joint account—which is grounded in statute and case law.

## B. Federal Law

■ When a case has been dismissed for lack of standing, the appellate court's fundamental inquiry is whether "the [appellant] [has] alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions." *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). The contours of this inquiry have been fleshed out by cases which hold that to show standing, a litigant must allege a "distinct and palpable injury to himself," *Warth v. Seldin,* 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975), fairly traceable to the "putatively illegal conduct of the defendant," *Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 99, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979), and likely to be redressed by the requested relief, *Simon v. Eastern Ky. Welfare Rights Org.,* 426 U.S. 26, 44–45, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976).

The standing inquiry is also informed by "whether the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Association of Data Processing Serv. Orgs., Inc.,* v. *Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970). The legislative history of forfeiture law indicates that a rather expansive "zone of interests" is protected by the innocent owner provision. *See* 21 U.S.C. § 881(a)(6) (providing a parallel "innocent owner" defense to that contained in 18 U.S.C. § 981(a)(2)—the provision at issue here). The Congressional Record indicates that Congress intended this provision to "be broadly interpreted to include any person with a recognizable legal or equitable interest in the property seized."

Joint Explanatory Statement of Titles II and III, 95th Cong., 2d Sess. (1978), *reprinted in* 1978 U.S.C.C.A.N. 9518, 9522.

Accordingly, courts have held that an allegation of ownership and some evidence of ownership are together sufficient to establish standing to contest a civil forfeiture. *United States v. $38,570 U.S. Currency*, 950 F.2d 1108, 1113 (5th Cir.1992) ("a claimant is required to submit some additional evidence of ownership along with his claim in order to establish standing to contest the forfeiture"). As we have said: "At this preliminary juncture . . . the claimant need not prove the full merits of her underlying claim. All that needs to be shown is a facially colorable interest in the proceedings sufficient to satisfy the case-or-controversy requirement and prudential considerations defining and limiting the role of the court." *116 Emerson Street*, 942 F.2d at 78 (citations and internal quotation marks omitted).

Courts generally do not deny standing to a claimant who is either the colorable owner of the res or who has any colorable possessory interest in it. *See United States v. $321,470.00 in United States Currency*, 874 F.2d 298, 303–04 (5th Cir.1989) (ownership or possessory interest sufficient); *United States v. $122,043.00 in United States Currency*, 792 F.2d 1470, 1473 (9th Cir.1986) (possession sufficient).

▆▆ We see little analytic difference between *Warth*'s approach and the owner-possessor approach in forfeiture cases. *See United States v. Contents of Accounts Nos. 3034504504 & 144–07143 at Merrill, Lynch, Pierce, Fenner & Smith, Inc.*, 971 F.2d 974, 985 (3d Cir.1992). An owner or possessor of property that has been seized necessarily suffers an injury that can be redressed, at least in part, by return of the seized property. *See id.*

While John Bulger has legal title to the defendant property, the question still remains whether he is a nominal or straw owner of the property or a legal owner who exercised dominion and control.

"[C]ourts have uniformly rejected standing claims put forward by nominal or straw owners. Thus, even possession of legal title to the res may be insufficient to establish standing to contest the forfeiture." *Id.* (citation omitted).

In *United States v. One 1981 Datsun 280ZX*, 563 F.Supp. 470 (E.D.Pa.1983), the court disregarded a car's legal title and denied a father standing because it was his son who stood "to suffer from the Datsun's forfeiture." *Id.* at 475. The court relied on evidence that the car was referred to as the son's, that the son frequently drove the car but the father did not, that the car was "turbocharged and capable of great speed" but the father was seventy-two years old and suffered from a heart condition, and that the father did not pay for the car. *See id.* Thus, though the car was kept at the father's house and the father held legal title to it, the district court held the father did not have standing to contest the forfeiture because the son was the only person who exercised dominion and control over the car. *See id.* at 476.

In *One 1981 Datsun 280ZX*, the court relied on *United States v. One 1945 Douglas C–54 (DC–4) Aircraft*, 604 F.2d 27 (8th Cir.1979) ("*1945 Douglas I*"), *appeal after remand, United States v. One 1945 Douglas C–54 (DC–4) Aircraft*, 647 F.2d 864 (8th Cir.1981) ("*1945 Douglas II*"), *cert. denied*, 454 U.S. 1143, 102 S.Ct. 1002, 71 L.Ed.2d 294 (1982). There, the district court initially ordered forfeiture of an aircraft to the government. *See 1945 Douglas I*, 604 F.2d at 27. An intervenor who held legal title to the aircraft appealed. The government contested this intervenor's standing in the district court but that court did not decide the standing issue. The Eighth Circuit then refused to reach the merits, holding that the standing question should be examined by the district court in the first instance. *See id.* at 29. Although the intervenor had tendered the money to purchase the aircraft, the court noted that an individual named Albert Kammerer ("Kammerer") had actually

provided the funds. The record in the district court also contained evidence tending to show that, on Kammerer's demand, the intervenor gave him a blank bill of sale for the aircraft. *See id.* It also showed that Kammerer considered himself the owner of the aircraft. *See 1945 Douglas II,* 647 F.2d at 866.

On remand, the district court held that Kammerer was the true "owner" of the res. *See id.* The court of appeals then affirmed on the merits because "[t]he evidence is consistent with Kammerer's dominion and control," *id.* at 867, and therefore the district court's conclusion was not clearly erroneous. *See id.* at 866; *see also United States v. 526 Liscum Dr.,* 866 F.2d 213, 217 (6th Cir.1989) ("[P]ossession of bare legal title by one who does not exercise dominion or control over property may be insufficient to establish standing to challenge a forfeiture.") (citing *United States v. 900 Rio Vista Blvd.,* 803 F.2d 625, 630 (11th Cir.1986) (emphasizing dominion and control in determining standing in a forfeiture case)).

Here, the res in question was derived from a joint account in John Bulger's and Whitey Bulger's names, at the South Boston Savings Bank Account No. 02–44–255305. It was also the source of all the funds contained in the other Bank of Boston account, Account No. 1491–77490, which at the time of seizure contained only the amount of the initial deposit of $100,-000 made by Whitey Bulger in the form of a check drawn on the original SBSB account, and the bank interest on that deposit. The money in the safe deposit box, according to John Bulger's testimony, was money he had withdrawn from the original SBSB account to prevent the government from seizing it.

John Bulger testified before the grand jury that Whitey Bulger opened the original SBSB account on his own initiative with funds in Whitey Bulger's exclusive possession:

A. My brother just came to me and asked me to sign some cards, and he was opening an account, I guess, and I put my name, my social security number and my address on there, on the little white cards.

Q. Your brother, James Bulger, came to you and asked you to—

A. Yes.

Q. —put your name on an—

A. Yeah.

Q. —account?

A. Yeah. He was—opening an account and he just asked me if I would go on it.

Whitey Bulger did not tell John why he was opening the account and John did not ask. In his verified claim filed in this case, John stated: "My brother, James, informed me of his wish to create a joint account at [SBSB] with myself, obtained my permission to do so and established the account using, *inter alia,* forms executed by me and him."

John believes that Whitey Bulger opened the account with his own money, and that all of the subsequent deposits were made by Whitey Bulger or others acting on his behalf. He denies knowledge of the source of any of the deposits made into the account, and does not know how deposits were made after Whitey Bulger became a fugitive, or by whom. John has never deposited any money in the account. He has referred to the account checkbook as "his [James's] checkbook," and to the money as "my brother, Jim's money." For example, he explained that he withdrew money from the account in August 1995 after he learned that the government had confiscated James's lottery proceeds:

I took it out of the South Boston Savings bank because of—I felt—I took it upon myself—it—it belongs to my brother, and I took it out, and I felt that the government, after they confiscated his lottery, I felt that they were going to confiscate his money, and I was just looking out.

The district court concluded that John's testimony as to his use of the account was consistent with a belief that the money was not his but instead belonged to his brother Whitey Bulger. Based on John Bulger's testimony, it held that John Bulger lacked dominion and control over the res and that his disclaimer of ownership of the property went far beyond the evidence of straw ownership put forward by the government in other forfeiture cases. In reaching its decision, the district court cited: (1) John's sworn testimony that he does not consider the money his; (2) his lack of deposit slips for the account; (3) his failure to faithfully read any of the bank statements until after Whitey Bulger became a fugitive; and (4) his acknowledgment that almost all of the withdrawals he made were either for Whitey Bulger's convenience or to carry out Whitey Bulger's directions and wishes. The district court found that the only factor weighing in John's favor was that he made withdrawals to finance his own vacations and to purchase a car. Nevertheless, the district court discounted this as indicium of ownership because John Bulger described these transactions as loans from Whitey Bulger that he feels obligated to repay.

After carefully reviewing the grand jury testimony, we disagree with the district court's conclusion and hold that John Bulger did indeed exercise sufficient dominion and control over the res to have standing in this civil forfeiture proceeding. From John Bulger's grand jury testimony it is apparent: (1) that the bank statements for the joint account were mailed to John Bulger's address; (2) that John Bulger personally stored the statements in an envelope in his kitchen; (3) that John Bulger made withdrawals of significant amounts and stored the money in his home; (4) that John Bulger, at almost all times, had physical possession of the checkbook in his home; and (5) that of the two parties, John Bulger was the party who wrote checks drawn on the account.

After Whitey Bulger became a fugitive, John Bulger made several transactions involving funds in the joint account without Whitey Bulger's explicit direction.

First, he gave a wedding present of $25,000 to Nancy Stanley. John Bulger stated: "I just thought that my brother would—where he wasn't around, would just—he told me a long time ago, he was going to have a wedding for Nancy Stanley, and he didn't. *And I just took it upon myself* . . . . I just—I—*I gave it to her.*" (emphasis added).

Second, John Bulger used money from the joint account to travel on trips to Florida and Bermuda. The government inquired about the source of the funds for the trips during John Bulger's grand jury testimony:

Q. You said you borrowed the money from the account?

A. Well, I—I took the money from the account and —

Q. You took the money from the account?

A. I took the money. My brother would let me take that money.

Third, John Bulger unilaterally loaned his sister, Jean Holland, one thousand dollars from the joint account.

Finally, John Bulger withdrew a significant amount of money, approximately $13,000, to buy a car. Excluding the gift to Nancy Stanley, John Bulger estimated that he spent "probably 12 or 13 thousand" dollars of the money in the joint account.

In rejecting John Bulger's claim that he exercised dominion and control over the account, the district court concluded that John Bulger had "negated any inference of ownership that these withdrawals might have raised by repeatedly describing these transactions as loans from [Whitey Bulger] that he feels obligated to pay back." (*Memorandum and Order* at 15.) We wish that the Bulgers' financial situation were so clear, for clarity is an element that the brothers Bulger joint account sorely lacks. The confusion as to whether the

money taken from the joint account was a loan, and if it was a loan, how the money was to be repaid is illustrated by the excerpt below from John Bulger's testimony:

Q. But just so that the record is clear on these vacation trips here, is it your testimony that you have actually paid that money back to the account since those trips, back to the joint account?

A. I think so, yes. I, I owe him some money, but *I just took some money,* and *I was going to pay him back,* you know, *when I see him* and that's, I've taken some money from time to time.

Q. Okay. Do you understand my question? I'm not asking you right now about money you've taken out of the account. What I'm asking is, you testified that the money you used to pay for these trips that you've described, including the trip to Bermuda, was money that you took out of the joint account, which you testified earlier was your brother's money, and you've characterized that withdrawal as a loan.

My, my question to you is, have you ever repaid—

A. Yes—

Q. —loan?

A. Yes.

Q. All right. And—

A. Yes, yes—

Q. —how have you repaid the loan?

A. In, in cash.

Q. In cash. So, you've made cash deposits to that account?

A. No.

Q. All right. How have you repaid the loan then?

A. I had some money in my house that I paid his bills with, and I just put it with that.

Q. So you're saying you repaid this loan by using your own money to pay his bills?

A. No. I owed him some money—

Q. Right—

A. —and I just put it in an envelope, and it belongs to him.

Q. Are you still holding that money in an envelope in your house, sir?

A. It's just about gone because I've been paying his bills.

(Emphasis added). Given that Whitey Bulger has not been seen for over four years, it is doubtful that John Bulger will be repaying his brother any time soon. Moreover, if he does see him, he will not have an accurate record of the amount he "owes." The government inquired:

Q. And since he left, have you kept any record of the money that you've borrowed from him?

A. No.

Q. And have you kept any record of the payments that you've, as you've described it, the cash you've taken out of your paycheck and put aside for him?

A. I've made some notations somewhere in the house where I paid his bills and how much I owe him a little bit, yes.

Q. Where are those?

A. I got, I got no idea.

John Bulger has estimated that he "owes" Whitey Bulger from $7,000 to $17,-000. As to how he came to such an estimate, the government asked the following questions and received the following answers:

Q. How would you create the estimate, sir?

A. I'd just tell my brother what I think I owe him and he'd, he'd accept that.

Q. So, you'd make it up?

A. I wouldn't make it up like I'm lying to him.

Q. What would you base your estimate on, sir?

A. Figures.

Q. Well, that's right. I'm trying to—

A. Yeah. I, I—

Q. If you base—

A. I may owe him $17,000.

The general state of confusion encompassing the funds in the joint account was best expressed in one of the questions posed to John Bulger by a grand juror:

Q. Sir, an hour ago, you told us that you owed your brother $7,000 to $8,000. Now, an hour later, it's up to $17,000. You have us confused. You have me confused.

A. Now, I owed some money from the car back in 1993, and I, I paid off quite a bit of it, and I had borrowed some money, and I've, since he's left, I've been paying his bills with some of his money and some of my own money, and I would say that I, I borrowed or I, I took some money over the last couple of years that I will pay him back.

While John Bulger's testimony is meandering and often inconsistent, at the end of the day, we believe that the quality and quantity of John Bulger's transactions involving the joint account are sufficient for us to conclude that he exercised sufficient dominion and control over the account to have standing to contest the civil forfeiture in this case. His contacts with the joint account clearly exceed those of the "straw owners" in the cases cited by the district court.

We disagree with the district court's conclusion that "[w]hatever the rights of a joint owner to a bank account, however characterized, John did not believe that he had a right to exercise them." (*Memorandum and Order* at 14 n. 3.) The fact of the matter is that John Bulger did act as the joint owner of a bank account would. As we noted above: (1) he received the statements at his residence; (2) he had physical possession of the checkbook; (3) he wrote checks drawn on the account; and (4) he made withdrawals from the account. All of these actions occurred both before and after Whitey Bulger's flight. There is also no denying that he is the only one who made any withdrawals after Whitey Bulger's flight. He withdrew money to be used for: (1) a wedding present for Nancy Stanley; (2) a loan to his sister; and (3) funds for various vacations.

The cases cited by the district court rejecting standing for the legal title holder of the res almost all invariably have one theme in common: a lack of involvement by the legal title holder with the res. In *United States v. Vacant Land Located at 10th Street & Challenger Way in Palmdale, California*, 15 F.3d 128 (9th Cir. 1993), the claimant had made no payments on the mortgage or taxes due on the property and did not even have a key necessary to enter it. *See id.* at 130. In *526 Liscum Drive*, the claimant held title to the property in Ohio where her father lived, but she herself lived in California and had only visited the property once. *See 526 Liscum Drive*, 866 F.2d at 215. In *One 1981 Datsun 280ZX*, although the claimant held legal title to the car and the automobile was kept at the father's house, it was doubtful that the seventy-two year old claimant with a heart condition would have driven the car. *See One 1981 Datsun 280ZX*, 563 F.Supp. at 475. Finally, in *United States v. Certain Real Property Located at River Road, Eliot, York County, Maine*, 839 F.Supp. 1 (D.Me.1993), *aff'd without published opinion*, 23 F.3d 395 (1st Cir.1994), although the claimant had legal title to the property, his father, who had transferred the property to him, continued to live on the property and pay all the necessary taxes and upkeep, and the claimant had no knowledge about the property. *See id.* at 3. John Bulger's involvement with the joint account was far greater than that of the claimants cited above. He acted as a joint owner would, writing checks and withdrawing money, and exercised dominion and control over the account.

Finally, we end by noting that by finding that John Bulger has standing in this case,

we do no more than give John Bulger the right to contest that the property is properly subject to forfeiture. If and only if John Bulger is correct in his assertions that the property is not subject to forfeiture, will he prevail.

## CONCLUSION

For the reasons stated above, we **VACATE** the order of the district court, and **REMAND** the matter to the district court for further proceedings consistent with this opinion.