# United States Court of Appeals
## For the First Circuit

Nos. 20-1042, 20-1095

UNITED STATES OF AMERICA,

Appellee,

v.

DONNA L. SACCOCCIA; VINCENT HURLEY,

Defendants, Appellants.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

[Hon. William E. Smith, U.S. District Judge]

Before

Lynch, Lipez, and Barron,
Circuit Judges.

J. Allen Roth, Esq. for appellants.
Zachary A. Cunha, Assistant United States Attorney, with whom
Aaron L. Weisman, United States Attorney, was on brief, for
appellee.

June 10, 2021

**LIPEZ, Circuit Judge.** Donna Saccoccia and her brother, Vincent Hurley, were convicted in 1993 for their role in a money laundering conspiracy controlled by Donna's husband Stephen Saccoccia.[1] Donna and Hurley appeal the district court's denial of Donna's Petition for a Writ of Error Coram Nobis, a petition that Hurley sought to adopt, seeking vacatur of a forfeiture judgment of approximately $136,000,000 in proceeds from the conspiracy.[2] Donna and Hurley contend that the Supreme Court's decision in Honeycutt v. United States, 137 S. Ct. 1626 (2017), should be applied retroactively to invalidate the forfeiture judgments against them.

We recently rejected Stephen's attempt to apply Honeycutt retroactively to vacate the forfeiture judgment against him. Saccoccia v. United States (Stephen's *Honeycutt* Appeal), 955 F.3d 171 (1st Cir. 2020). We reject the efforts of Donna on essentially the same grounds applicable to Stephen. We reject the efforts of Hurley on different grounds.

---

[1] Because Donna and Stephen Saccoccia share the same last name, we refer to them by their first names for clarity.

[2] Technically, the district court denied Hurley's motion to adopt Donna's petition when it denied Donna's petition. The court clarified, however, that it assumed Hurley adopted all of Donna's substantive arguments and addressed the application of those arguments to Hurley in denying both the petition and the motion.

The facts of this case are fully set forth in our several opinions affirming appellants' convictions, sentences, and forfeiture judgments on direct appeal as well as Stephen's *Honeycutt* Appeal. See United States v. Hurley (Appellants' Direct Appeal), 63 F.3d 1 (1st Cir. 1995); United States v. Saccoccia (Stephen's Direct Appeal), 58 F.3d 754 (1st Cir. 1995); United States v. Saccoccia (Defendants' Forfeiture Order), 823 F. Supp. 994 (D.R.I. 1993). Here, we restate only those facts necessary to address the issues raised in Donna and Hurley's petition.

## A.    The Money Laundering Conspiracy

Prior to 1992, Stephen owned and operated a network of precious metals businesses, including Saccoccia Coin Company ("Saccoccia Coin") in Rhode Island, Trend Precious Metals ("Trend") in New York and Rhode Island, and two similar companies in California. Appellants' Direct Appeal, 63 F.3d at 6. Beginning in the late 1980s, Stephen laundered drug money on behalf of a Colombian drug cartel through his businesses. Id. Upon receiving funds from a cartel courier, "in accordance with instructions received from [Stephen] or his wife, Donna," associates of Stephen would purchase money orders, gold, or cashier checks, most of which were payable to a Trend account at Citizens Bank jointly owned by Stephen and Donna, and then the Saccoccias would wire the funds to

foreign bank accounts.  Stephen's Direct Appeal, 58 F.3d at 762; see also Appellants' Direct Appeal, 63 F.3d at 6-7.

## B.    Trial and Sentencing

In 1991, a federal grand jury returned an indictment charging Stephen, Donna, Hurley, and several associates with conspiracy under the Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. § 1962(d), as well as several substantive offenses.[3]  All defendants were convicted of participation in a RICO conspiracy.  Donna was also convicted of thirteen counts of money laundering, in violation of 18 U.S.C. § 1956, and forty-seven counts of unlawful transactions, in violation of 18 U.S.C. § 1957.  She was sentenced to fourteen years in prison followed by two years of supervised release.  Appellants' Direct Appeal, 63 F.3d at 7.  Hurley was convicted of one count of structuring transactions to evade reporting requirements, in violation of 31 U.S.C. § 5324(3), and one count of interstate travel in aid of racketeering, in violation of 18 U.S.C. § 1952, and was sentenced to eighteen years in prison followed by three years of supervised release.[4]  Appellants' Direct Appeal, 63 F.3d

_____

[3] Stephen was tried separately "due to the illness of his counsel."  Appellants' Direct Appeal, 63 F.3d at 6.

[4] Stephen was convicted of one count of conspiracy under RICO, thirty-six counts of engaging in monetary transactions with criminally derived property, in violation of 18 U.S.C. § 1957, thirteen counts of money laundering, in violation of 18 U.S.C. § 1956, and four counts of violating the Travel Act, 18 U.S.C. § 1952.  Stephen's *Honeycutt* Appeal, 955 F.3d at 173.  He was

- 4 -

at 7. The jury, by special verdict, also imposed a forfeiture judgment on Hurley in the amount of $136,344,231.86. Id. at 20. No other defendants elected to have the jury decide their forfeiture liability, thereby leaving that determination to the district court.

## C. Donna's Role in the Conspiracy

We have previously stated that Donna "assisted her husband [Stephen] in most aspects of the [money laundering] operation."[5] Id. at 7. She "relayed his instructions to the others [involved in the conspiracy]." Id. Stephen and Donna wired over $136 million out of the jointly owned Trend account to an assortment of foreign banks.[6] Defendants' Forfeiture Order, 823

---

sentenced to 660 years in prison. Stephen's Direct Appeal, 58 F.3d at 762.

[5] Appellants do not challenge the underlying facts.

[6] There is some confusion in the record as to whether the full $136 million was wired to foreign accounts from the Trend account or whether a portion was wired from other accounts. On direct appeal, we stated that "[the Saccoccias] wired over $136 million to foreign bank accounts primarily in Colombia" but that only approximately "$97 million of th[at] amount was wired from the Trend account." Appellants' Direct Appeal, 63 F.3d at 7. That statement contradicts the district court's finding in affirming Donna's forfeiture judgment that the full $136 million was wired out of the jointly controlled Trend account. Defendants' Forfeiture Order, 823 F. Supp. at 999 ("Between January 1, 1990 and April 2, 1991, Stephen and Donna Saccoccia wired $136,344,231.86 from Trend's account at Citizens to various Colombian and other foreign bank accounts . . . thereby completing the money laundering cycle."). On appeal in this case, the government relies on the district court's finding to contend that the full $136 million was wired from the Trend account. Appellants do not challenge that conclusion or otherwise argue that the result

- 5 -

F. Supp. at 999; see also Stephen's Direct Appeal, 58 F.3d at 762-63. Donna also "helped count money, [] personally authorized the wire transfer of more than $38 million from the Trend account to foreign bank accounts," Appellants' Direct Appeal, 63 F.3d at 11, and "caused phony invoices to be issued," Defendants' Forfeiture Order, 823 F. Supp. at 998.

At sentencing, the district court found it "extremely difficult" to characterize Donna's role in the conspiracy. On the one hand, the court found that Donna was "involved in almost the entire spectrum of money-laundering activities that were engaged in by the conspiracy." She "helped count money," "helped keep the books," and "wired laundered money out of the country." The court concluded that, given those activities, "[Donna's] role was significant. It may not [have] be[en] major but it can hardly be characterized as minimal."

The court clarified, however, that it viewed Donna as "appreciably less culpable than some of the other defendants." It emphasized that she "performed tasks that were primarily clerical and ministerial in nature" and that she "acted pursuant to relatively narrow and explicit instructions principally from Stephen Saccoccia." The court concluded that Donna "exercised

_____

would be different if we were to assume some portion of the $136 million was transferred from another account. Given that failure, we proceed on the assumption that the full $136 million was transferred out of the Trend account.

very little discretion and . . . exerted no authority over others." The court also recognized the unique influence Stephen had over Donna as her husband but concluded it was "disingenuous at best" to suggest that Donna did not know that her actions were illegal.

Ultimately, the court concluded that Donna's level of culpability was "somewhat below th[e] level [of the conspiracy's lieutenants] and . . . somewhat above the level occupied by [others in the conspiracy]." The court viewed Donna's participation "in terms of the entire one hundred thirty-seven million dollar conspiracy," and concluded that she was a "smaller fish in a larger pond than she would [have] be[en] if her responsibility were calculated on the basis of a lesser amount."

### D. Hurley's Role in the Conspiracy

At sentencing, the district court concluded that Hurley "st[ood] a little higher in the pecking order than some of the other defendants."[7] The court found that Hurley "pretty much ran [Saccoccia Coin] and [] had a closer relationship with the true leader of th[e] organization, Stephen Saccoccia, than others did," which the court speculated was an "unfortunate incident of marriage," referring to the fact that Hurley is Stephen's brother-in-law. The court emphasized Hurley's lengthy participation in the conspiracy and concluded that he was "involved in more facets

---

[7] When sentencing Donna, the court classified Hurley as a lieutenant.

of th[e] organization" than his codefendants, because he "went to New York on several occasions, both to count money and help pick it up. [He was] not just a courier like some of the other defendants were."

The court recognized, however, that the primary reason Hurley was facing a high offense level was "the amount of money for which [he] ha[d] been held responsible." The Court explained that Hurley "did not have a large stake in th[at] money or the profits made from [it]." The court concluded that it was "pretty clear" that "most of that money went to one person and one person only and that was Stephen Saccoccia."

E.    The Forfeiture Judgments

Shortly after sentencing, the government sought a forfeiture judgment against each defendant pursuant to the forfeiture provision of the RICO statute, 18 U.S.C. § 1963(a), arguing that "each defendant should forfeit . . . $136,344,231.86, which the government [argued was] the amount 'constituting or derived from [the] proceeds' obtained by the defendants from racketeering activity." Defendants' Forfeiture Order, 823 F. Supp. at 1000.

The district court initially stated that each defendant was required to forfeit only property obtained "directly or indirectly" by that defendant pursuant to § 1963(a). Id. at 1004. It clarified, however, that "it is well established that, for

sentencing purposes, a defendant is accountable for the acts of co-conspirators that were committed in furtherance of the conspiracy and were reasonably foreseeable by the defendant." Id. at 1004. Indeed, the Guidelines "expressly require that . . . adjustments for specific offense characteristics be determined on the basis of 'all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity.'" Id. In a money laundering conspiracy, the court reasoned, "one of the specific offense characteristic adjustments is a function of the amount of money involved" and is therefore calculated for each defendant by "includ[ing] the reasonably foreseeable amounts laundered by co-conspirators in furtherance of the conspiracy." Id.

Criminal forfeiture, the court explained, "is a form of punishment" and, hence, "it follows that the same principles of sentencing accountability should apply." Id. For that reason, the court concluded that, for purposes of § 1963(a)(3), "a defendant should be deemed to have 'obtained' amounts 'obtained' by co-conspirators in furtherance of the conspiracy to the extent that receipt of those amounts was reasonably foreseeable." Id.

Applying those principles, the court concluded that several of the low-level participants in the conspiracy had limited perceptions of the amounts of money being laundered and, hence, could have reasonably foreseen only a percentage of the total

forfeitable amount. Id. at 1006. As for Donna and Hurley, the court concluded that they both "reasonably could have foreseen the receipt of $136,344,231.86 in proceeds," reflecting the total amount laundered. Id. In support of that conclusion, the court explained that the evidence "establishe[d] that the Saccoccias' activities spanned the entire spectrum of the conspiracy's operation from receiving of the cash in New York to wiring laundered proceeds back to Colombia." Id. Hurley "also participated directly in most facets of the overall scheme including collecting cash from couriers, transporting it to Rhode Island, counting it and dividing it into smaller lots so that it could be taken to banks to purchase cashier's checks." Id.

On direct appeal, this court affirmed the convictions, sentences, and forfeiture judgments of Stephen, Donna, and Hurley. Appellants' Direct Appeal, 63 F.3d at 21-24; Stephen's Direct Appeal, 58 F.3d at 782-86. As to forfeiture, we relied on the reasoning of the district court and concluded that a defendant may be held liable for "funds obtained by other members of the conspiracy . . . only to the extent that [those funds] were reasonably foreseeable to the particular defendant." Appellants' Direct Appeal, 63 F.3d at 22.

F.   **Honeycutt** and Stephen's **Honeycutt** Appeal

In 2018, more than twenty years after his forfeiture judgment became final, Stephen sought its vacatur based on the

Supreme Court's 2017 decision in Honeycutt. Stephen's *Honeycutt Appeal*, 955 F.3d at 172. In Honeycutt, the Supreme Court considered whether a "defendant may be held jointly and severally liable for property that his co-conspirator derived from the crime but that the defendant himself did not acquire." 137 S. Ct. at 1630. Honeycutt involved a conspiracy to sell an "iodine-based water-purification product," which can be used to manufacture methamphetamine, from a hardware store at which the defendant, Honeycutt, managed sales and inventory. Id. The government sought a forfeiture judgment against Honeycutt for the amount of the conspiracy profits outstanding after his co-conspirator's forfeiture payment pursuant to 21 U.S.C. § 853(a), which governs forfeiture of the proceeds derived from drug crimes. Id. at 1631. The district court declined to enter a forfeiture judgment because Honeycutt was a salaried employee who had "no controlling interest in the store" and "did not stand to benefit personally" from the conspiracy. Id. The Sixth Circuit reversed, holding that the defendant, as a co-conspirator, was "jointly and severally liable for the proceeds of the conspiracy." Id. (quoting United States v. Honeycutt, 816 F.3d 362, 380 (6th Cir. 2016)).

The Supreme Court reversed the decision of the Sixth Circuit. Id. at 1635. It held that a defendant could not be ordered to forfeit property pursuant to § 853(a) based on a theory of joint and several liability where he never "actually acquired

- 11 -

[the property] as a result of the crime." Id. at 1635. It reasoned that § 853(a) limits forfeiture to "property the defendant himself obtained," which precludes joint and several liability for all co-conspirators. Id. at 1633. Hence, the Court concluded, because Honeycutt never obtained the tainted property as a result of the crime, he could not be ordered to forfeit that property under § 853(a). Id. at 1635.

Relying on Honeycutt, Stephen filed a complaint in federal district court seeking relief under various procedural mechanisms, including 28 U.S.C. § 1355,[8] writs of coram nobis, audita querela,[9] and mandamus, return of property pursuant to Fed. R. Crim. P. 41(g), and declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201, 2202. Stephen's *Honeycutt* Appeal, 955 F.3d. at 173-74. The government moved to dismiss for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1), and for failure to state a claim upon which relief could be granted

---

[8] Pursuant to 18 U.S.C. § 1355(a), the "district courts shall have original jurisdiction . . . of any action or proceeding for the recovery or enforcement of any fine, penalty, or forfeiture . . . incurred under any Act of Congress."

[9] Audita querela is "[t]he name of a common law writ constituting the initial process in an action brought by a judgment defendant to obtain relief against the consequences of the judgment on account of some matter of defense or discharge arising since its rendition and which could not be taken advantage of otherwise," United States v. Holder, 936 F.2d 1, 2 (1st Cir. 1991) (quoting Audita Querela, Black's Law Dictionary 120 (5th ed. 1979)), and was "expressly abolished by amendments to Fed. R. Civ. P. 60(b), effective in 1948," id.

pursuant Fed. R. Civ. P. 12(b)(6). Id. at 174. The district court granted the government's motion, based on its conclusion that Stephen failed to identify a procedural avenue for relief and did not reach the Honeycutt issue. Id.

We affirmed the district court, but on different grounds, concluding that even if Stephen had identified a procedural route for relief, which we did not decide, Honeycutt did not require vacatur of his forfeiture judgment. Id. at 175-76. Stephen, we explained, neglected a "critical part of Honeycutt's holding: that any bar against joint and several co-conspirator liability articulated there applies only to defendants who did not actually possess or control the funds at issue." Id. at 175. Stephen failed to proffer any facts that contradicted the district court's finding that all the funds involved in the conspiracy passed through a bank account that he controlled. Id. We concluded that there was ample evidence in the record that Stephen obtained the proceeds of the scheme and, therefore, even if Honeycutt applied and Stephen could identify a proper procedural mechanism to support its application, he failed to demonstrate that his conduct fell within Honeycutt's ambit such that it would require vacatur of his forfeiture judgment. Id. at 175-76.

### G. The District Court's Decision in this Case

Similarly seeking to apply Honeycutt to vacate her forfeiture judgment, Donna filed a "Petition for Writ of Error

Coram Nobis to Vacate Forfeiture Judgment and Motion for Refund," pursuant to 28 U.S.C. §§ 1355, 1651(a). Shortly thereafter, Hurley filed a motion seeking to adopt the arguments in Donna's petition.

Taking an approach similar to ours in rejecting Stephen's Honeycutt arguments, the district court assumed that the writ of coram nobis is a proper procedural vehicle, that the holding of Honeycutt applies to the statutes at issue in this case, and that Honeycutt applies retroactively, and concluded that appellants' claims fail on their substance. The court explained that the sentencing judge found that Donna was "deeply involved in the conspiracy" and that "both Donna and Stephen controlled the account through which the $136,344,231.86 was laundered." With respect to Hurley, the court explained that he "chose to have the jury determine, by special verdict form, that he was liable for the same amount of money." For those reasons, the court concluded that "there is no legal merit to the[] argument that the forfeiture judgments against Donna and [Hurley] should be vacated because they were based on joint and several liability." In any event, the court concluded that the alleged errors were not "fundamental to the underlying convictions," and thus were insufficient to state a plausible claim for coram nobis relief. For the same reasons, the court rejected appellants' motion for refund pursuant to 28 U.S.C. § 1355.

Appellants invite us to decide several issues, including whether coram nobis or 28 U.S.C. § 1355 is a proper procedural vehicle for the relief requested, whether Honeycutt is retroactively applicable in these circumstances, and whether Honeycutt applies to the statutes under which appellants' forfeiture judgments arose. We decline to answer those questions because we conclude, as we did in Stephen's Honeycutt appeal, that even if we resolved those questions in favor of appellants, their claims fail. See Stephen's *Honeycutt* Appeal, 955 F.3d at 174.

Assuming then that coram nobis is a proper procedural mechanism for relief -- without making any judgment as to whether that is the case -- we review the legal conclusions of the district court de novo.[10] Appellants contend that their forfeiture judgments must be vacated because the district court found at sentencing that neither appellant was "actually responsible for

_____

[10] As noted, appellants also sought relief pursuant to 28 U.S.C. § 1355(a), which provides that the "district courts shall have original jurisdiction . . . of any action or proceeding for the recovery or enforcement of any fine, penalty, or forfeiture, pecuniary or otherwise, incurred under any Act of Congress." We have not yet held whether this general jurisdictional provision provides a cause of action for a defendant to challenge a final criminal forfeiture judgment, and appellants proffer no cases in which a court has similarly held. We need not confront this issue here, however, because we have assumed without deciding that a writ of coram nobis is procedurally proper and we proceed to reject appellants' claims on that basis. If we were to conclude that § 1355 provided an appropriate avenue for relief, we would similarly conclude that appellants lose.

the $136 million." Donna contends that the district court's statements demonstrate that she was merely a "little fish." Hurley says those statements mean that he was responsible for no more than $50,000. Appellants further contend that our affirmance of Stephen's forfeiture judgment for the full $136 million "necessarily precludes any forfeiture for the same funds against any other person since the Supreme Court found no jurisdiction for 'joint and several' liability forfeiture."

As we explained in affirming the district court's denial of Stephen's attempt to apply Honeycutt to vacate his forfeiture judgment, Honeycutt's "bar against joint and several co-conspirator liability . . . applies only to defendants who did not actually possess or control the funds at issue." Stephen's *Honeycutt* Appeal, 955 F.3d at 175. Thus, where two individuals, each through their own actions "obtain" the funds at issue, each may be held liable for forfeiting the amount of funds he or she personally "obtained." See id.; see also Honeycutt, 137 S. Ct. at 1630, 1635. The government agrees that its total recovery from all defendants is capped at the amount of $136,344,231.36 -- the total amount of tainted proceeds derived from the RICO conspiracy. So long as there is an individualized finding that a defendant "obtained" the tainted proceeds subject to the government's forfeiture claim, the government may, without running afoul of

Honeycutt, collect the amount of those obtained proceeds[11] from that defendant subject to the constraint that the government agrees applies here -- it "can collect [the] $136 million only once."

## A. Application of Honeycutt to Donna

The key question is whether Donna and Hurley each "obtained, directly or indirectly" the proceeds of the conspiracy. See 18 U.S.C. § 1963(a)(3); see also Honeycutt, 137 S. Ct. at 1632. The Supreme Court has explained that "obtained," in the context of § 1963(a), means "'to come into possession of' or to 'get or acquire.'" Honeycutt, 137 S. Ct. at 1632 (quoting Random House Dictionary of the English Language 995 (1966)). We recently clarified in United States v. Cadden that a person "obtains" property for purposes of § 1963(a) "even when the property is merely 'held in custody' before being 'passed along to its true owner.'" 965 F.3d 1, 39 (1st Cir. 2020) (quoting Appellants' Direct Appeal, 63 F.3d at 21). We also explained there that an individual "obtains" all funds that are held, even temporarily, in

_____

[11] Because the funds that were originally subject to forfeiture evidently are no longer available -- the $136 million was apparently transferred to foreign bank accounts during the course of the conspiracy -- the government must file a motion for substitute asset forfeiture each time it seeks to collect on the forfeiture judgments against the various defendants in this case. See 18 U.S.C. § 1963(m) ("If any of the [tainted property] . . . cannot be located . . . [or] has been transferred or sold . . . the court shall order the forfeiture of any other property of the defendant up to the value of [the tainted property]."). According to the record, the government has not filed such a motion in over a decade.

an account jointly owned with another because, as joint owners, both individuals have "'the right to withdraw all the funds' from the account, 'or any portion of them,' and therefore could 'effectively exercise control over the entire interest, or any part of it, and divest totally or partially, the interest of'" the other account owner. Id. (quoting United States v. U.S. Currency, $81,000.00, 189 F.3d 28, 34 (1st Cir. 1999)).

Applying the rule in Cadden to this case is straightforward. Donna was a joint owner of the Trend account. As a joint owner, she had control over the account and the right to withdraw and wire funds. Indeed, the district court concluded at sentencing that Donna "personally authorized the wire transfer of more than $38 million from the Trend account to foreign bank accounts." Appellants' Direct Appeal, 63 F.3d at 11. The sentencing court also found that "Stephen and Donna Saccoccia wired $136,344,231.86" from the jointly controlled Trend account to various foreign bank accounts, "thereby completing the money laundering cycle," Defendants' Forfeiture Order, 823 F. Supp. at 999, 1006, rendering that entire amount tainted as proceeds from racketeering activity. Donna does not challenge either of those findings. As we concluded in Cadden, ownership over an account that contains tainted funds, regardless of who originally earned the money or deposited it into the account, is "more than

sufficient for acquisition purposes" under § 1963(a)(3). <u>Cadden</u>, 965 F.3d at 39.

The conclusion that Donna "obtained" the tainted funds in the Trend account is not undermined by the sentencing court's finding that she acted primarily at the behest of Stephen and had a lesser level of culpability in the grand scheme of the conspiracy. Although she may have chosen not to take any action with respect to the Trend account without Stephen's approval, she was nonetheless a joint account owner and, as such, had the legal authority to do so. Moreover, the sentencing court's determination that Donna's role in the conspiracy was minor says nothing about whether she "obtained" the funds of the conspiracy. As we explained in <u>Cadden</u>, her ownership over the account through which the tainted money flowed is enough to demonstrate she obtained the funds for purposes of forfeiture even after <u>Honeycutt</u>. <u>Id.</u> at 39.

B. **Application of <u>Honeycutt</u> to Hurley**

Assuming it could reach the merits, the district court denied Hurley's coram nobis petition because it concluded that Hurley's forfeiture judgment could be justified on the basis of the jury's special verdict concluding that the full $136 million in proceeds from the conspiracy was attributable to Hurley. That ruling was an error. Although Hurley elected to have his forfeiture liability decided by the jury, the jury applied the

pre-Honeycutt standard -- also known as Pinkerton[12] liability -- that a defendant is liable for funds obtained by his co-conspirators in furtherance of the conspiracy to the extent that receipt of those amounts was reasonably foreseeable. Defendants' Forfeiture Order, 823 F. Supp. at 999. As we have explained, Honeycutt rejects Pinkerton for purposes of forfeiture liability under § 853(a)(1) (and, we are assuming, under § 1963(a)(3)) and instead requires a court to consider whether Hurley "obtained, directly or indirectly" the proceeds of the conspiracy. See Honeycutt, 137 S. Ct. at 1634-35. Hence, Hurley's forfeiture judgment cannot be justified by relying on the jury verdict, and we must ask instead whether he "obtained" the full $136 million, such that any error in relying on the jury verdict was harmless.

Hurley's forfeiture liability potentially presents a more complicated picture than that of Donna. Unlike Donna, Hurley did not have an ownership interest in an account through which the entire proceeds of the conspiracy flowed, although he was deeply involved in the conspiracy as a lieutenant. In that sense, he was different from the employee in Honeycutt, compared by the Court to a student who was recruited to distribute marijuana on a college campus for a salary amounting to a mere fraction of a multi-million-dollar criminal conspiracy. Honeycutt, 137 S. Ct. at 1631-

---

[12] Pinkerton v. United States, 328 U.S. 640 (1946).

- 20 -

32. Hurley was essentially Stephen's right-hand man. He played a significant role in facilitating racketeering activities by, on several occasions, controlling the transportation, counting, packaging, and funneling of tainted property.[13] Such detailed and prolonged involvement demonstrates that Hurley is far from the low-level operative that concerned the Court in Honeycutt.

On the other hand, we have not yet defined the parameters of Honeycutt and what constitutes "indirectly obtaining" tainted proceeds. Some courts have held that evidence demonstrating that an individual held a leadership role and was involved in most facets of the conspiracy is sufficient to hold that individual liable for obtaining the tainted proceeds of the conspiracy. See United States v. Cingari, 952 F.3d 1301, 1306 (11th Cir. 2020) (explaining that Honeycutt would not bar liability where the defendant "played a []significant role in the crime, [and] the evidence demonstrated that he personally worked on [a large portion of] fraudulent applications"); United States v. Bangiyev, 359 F.

_____

[13] We previously stated that a portion of the tainted funds was deposited into accounts nominally owned by Hurley. Appellants' Direct Appeal, 63 F.3d at 7. Hurley contends that in doing so we erroneously attributed to him the conduct of another co-conspirator. Although the record is unclear, there is some support for Hurley's objection; the district court's forfeiture judgment states that it was co-defendant Anthony DeMarco, not Hurley, who nominally controlled several accounts through which tainted funds passed. Defendants' Forfeiture Order, 823 F. Supp. at 999. However, that uncertainty does not affect our rationale for rejecting Hurley's claim for relief.

Supp. 3d 435, 440 (E.D. Va. 2019) ("Honeycutt bases its reasoning on drawing a distinction between a mastermind who controls the criminal operation and a lower figure who only has access to and control over the smaller amount of tainted property directly in his possession . . . . [L]ower courts have declined to apply Honeycutt in cases where the defendant held a position of control in the criminal operation." (citations omitted)).

We need not resolve the issue of whether Hurley is entitled to a more limited forfeiture judgment here, however, because Hurley has waived the issue by failing to provide us with any factual basis to support his argument that he did not obtain the tainted funds either directly or indirectly. The government alleges that any error in Hurley's forfeiture liability determination was harmless because the evidence shows that Hurley obtained the funds by "handling and controlling" the cash, "collecting, packaging, and funneling illicit funds for transfer," "transporting [cash] to Rhode Island, [and] counting and dividing it into smaller lots so that it could be taken to banks to purchase cashier's checks." In response, Hurley fails to point to any evidence in the record explaining why or how his personal role in the conspiracy warrants a reduction in his forfeiture liability despite the fact that he is in the best position to explain the extent of his role. Moreover, he failed to request an evidentiary

hearing on the issue below.[14]  Instead, Hurley cherry-picks quotes from his sentencing hearing in an attempt to show that his role in the conspiracy was more limited than the government posits.

It is the job of the appellant, not the court, to "ferret out and articulate the record evidence considered material" to a legal theory on appeal.  See, e.g., Conto v. Concord Hosp., Inc., 265 F.3d 79, 81 (1st Cir. 2001).  Hurley has failed to do so and, hence, the issue of a more limited forfeiture judgment must be deemed waived.  See id. at 81-82.

Affirmed.

---

[14] Hurley did "request[] that the Government's motion to deny [the] petition without a hearing be denied," but acknowledges that he made no affirmative request for a hearing in response.