# United States Court of Appeals
## For the First Circuit

---

Nos. 06-1187, 06-1423, 06-1444

UNITED STATES,

Plaintiff, Appellee/Cross-Appellant,

v.

UNION BANK FOR SAVINGS & INVESTMENT (JORDAN),

Claimant, Appellant/Cross-Appellee,

REUVEN KRAUZER,

Claimant, Appellant,

THE BANK OF NEW YORK BY THE UNION BANK FOR SAVINGS
AND INVESTMENTS JORDAN, Funds on Deposit in Account
No. 8900057173 up to the Value of $2,343,905.33, ET AL.,

Defendants-In-Rem.

---

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Paul J. Barbadoro, U.S. District Judge]

---

Before

Boudin, Chief Judge,
Lynch and Lipez, Circuit Judges.

---

Jeffrey C. Spear, with whom Martha Van Oot and Orr & Reno,
P.A. were on brief, for appellant Union Bank for Savings &
Investment (Jordan).
Christopher H.M. Carter, with whom Hinckley, Allen & Snyder,
LLP was on brief, for appellant Reuven Krauzer.

Gretchen Leah Witt, Assistant United States Attorney, with whom Jean B. Weld, Assistant United States Attorney, and Thomas P. Colantuono, United States Attorney, were on brief, for appellee.

———————————————

May 18, 2007

———————————————

**LYNCH**, **Circuit Judge**.  This case raises a novel issue of the proper construction of 18 U.S.C. § 981(k), a civil forfeiture provision concerned with interbank accounts of foreign banks, which was added as part of the USA PATRIOT Act, Pub. L. No. 107-56, § 319(a), 115 Stat. 272, 311-12 (2001).

Section 981(k) provides for the forfeiture of amounts in interbank accounts held by a foreign bank at banks in the United States when forfeitable funds are deposited into an account at the foreign bank.  18 U.S.C. § 981(k)(1)(A).  Frequently, however, foreign banks are innocent of the underlying wrongdoing that forms the basis for the forfeiture.  As a result, if a foreign bank were allowed to file a claim for amounts seized from its interbank account, as was the case before enactment of section 981(k), it would often succeed in recovering the seized amounts as an "innocent owner" of the funds, see id. § 983(d), even when the foreign depositor might not qualify as an innocent owner.

To avoid this result, Congress in enacting section 981(k) also provided that generally the foreign depositor, and not the foreign bank, is considered an "owner" of the seized funds, eligible to challenge the forfeiture on innocent owner or other grounds.  See id. § 981(k)(4)(B)(i).  An exception to this designation of ownership applies, however, and the foreign bank is the owner of the funds, to the extent that the bank has "discharged all or part of its obligation to the prior owner of the funds" by

-3-

the time of the seizure. Id. § 981(k)(4)(B)(ii)(II). It is this exception that is at the heart of this case.

In this case, the United States seized over $2.8 million from an interbank account held by Union Bank for Savings & Investment (Jordan) at the Bank of New York, claiming that, under section 981(k), these funds corresponded to proceeds of a Canadian telemarketing fraud conspiracy. A parallel indictment charged sixteen defendants with violations of federal RICO, mail fraud, and wire fraud statutes in that conspiracy to defraud more than eighty Americans, many of them elderly widows and widowers. Proceeds of the fraud, in the form of cashier's checks sent by those defrauded, had been eventually deposited into two accounts at a branch of Union Bank (Jordan) in Ramallah in the West Bank, one in the name of Samir Esseileh and the other in the name of his brother, Mohammed Ghaleb Esseileh. In response to the seizure, Union Bank (Jordan), but not the Esseilehs, claimed ownership of the seized funds, arguing that the exception at section 981(k)(4)(B)(ii)(II) applied. The Bank of New York, the bank at which the interbank account was located, is not a party in these proceedings.

In ruling on cross-motions for summary judgment, the district court held that the "obligation" referred to in section 981(k)(4)(B)(ii)(II) is the obligation of a bank to repay amounts on deposit. In so holding, the court rejected the contention of Union Bank (Jordan) that the discharge of its obligations should be

-4-

measured against its ability to obtain recourse from its depositors under banking law. We agree with the district court on this point; the interpretation posited by Union Bank (Jordan) is contrary to the language of the statute and would undermine Congress's intent in enacting section 981(k).

The district court also held that while the relevant obligations are not limited to those arising from the specific account into which the forfeitable funds were deposited, "obligations [that] do not arise from and are not in any way connectable to the obligation that arose from the receipt of the forfeitable funds" do not count as obligations under section 981(k). The court based this on the view that the principle in section 984(a)(2) limiting the forfeiture of substitute property to that found in the "same place or account" should inform the interpretation of the term "obligation" in section 981(k)(4)(B)(ii)(II). On this point, we do not agree. In attempting to chart this middle course between the government's and the bank's positions, the district court borrowed concepts relevant to determining the forfeitability of funds in ordinary accounts to decide the question of ownership of funds in interbank accounts. Both the language and the legislative history of section 981(k) demonstrate that Congress did not intend to apply analogous substantive limits to forfeitability in determining ownership under section 981(k). Thus, we hold that for purposes of section 981(k),

-5-

obligations include amounts in any account held at the time of the seizure by anyone who was an owner of the funds at the time they were deposited.

Union Bank (Jordan) makes other arguments, which were rejected by the district court, and which we also reject. We reject the bank's claim that the forfeiture is excessive under the Eighth Amendment because we find the forfeiture is not punitive relative to Union Bank (Jordan). We also hold that the district court did not abuse its discretion in requiring a joint statement of undisputed material facts for purposes of the cross-motions for summary judgment.

In addition, we find no abuse of discretion in the district court's striking as untimely the claim of Reuven Krauzer, an earlier holder of the cashier's checks at issue, who also appeals.

I.

The facts we describe are drawn from the Joint Statement of Undisputed Material Facts filed by the government and Union Bank (Jordan), or are otherwise undisputed, except as noted.

Union Bank (Jordan) was chartered by the Central Bank of Jordan in 1990 and has its main branch in Amman, Jordan. Since 1995, it has operated a branch in Ramallah, in the West Bank in the Palestinian territories.

On October 18, 2002, the United States seized $2,343,905.33 from a U.S. interbank account held by Union Bank (Jordan) at the Bank of New York, as part of a seizure of over $4.5 million from the interbank accounts of a number of different foreign banks. The government simultaneously filed a complaint against the seized funds in federal district court in New Hampshire for forfeiture in rem. On November 19, 2003, the United States seized an additional $501,228.18 from the same Union Bank (Jordan) account at the Bank of New York, of which $30,000.00 was subsequently released, for a total seizure from this interbank account of more than $2.8 million. Proceedings under the second seizure were consolidated into the first.

This $2.8 million corresponded to the combined face value of 124 cashier's checks drawn on U.S. banks and deposited into customer accounts at Union Bank (Jordan). The government alleged that these cashier's checks (and others corresponding to the balance of the $4.5 million seized) were forfeitable as the proceeds of a Canadian telemarketing fraud scheme that victimized American citizens. The perpetrators of the scheme convinced dozens of individuals to send cashier's checks of $5,000 to $100,000 or more to designated post office boxes in Montreal, purportedly to cover expenses associated with large prizes from a Canadian sweepstakes or lottery.

After receiving the checks, the perpetrators of the fraud sold them to a restaurant owner in Montreal in exchange for Canadian currency. He in turn sold the cashier's checks to a person with connections in Israel. The 124 checks at issue in this case were all eventually sold to Reuven Krauzer, a money changer in Jerusalem.

Krauzer then sold the checks to Mohammed Ghaleb Esseileh. Mohammed Ghaleb Esseileh and his brothers Samir and Talal, together with other family members, operated a money exchange business in East Jerusalem. At times relevant here, various members of the Esseileh family maintained bank accounts at Union Bank (Jordan) in the course of their money exchange business; the business as a whole did not have a business account at the bank.

Each of the 124 cashier's checks was deposited into one of two Esseileh accounts at Union Bank (Jordan), both of which the Esseilehs used for the deposit of checks received in the ordinary course of business. The first account, opened on February 28, 1996, was in Samir's name, although, pursuant to a written agreement with the bank, his brother Mohammed Ghaleb also had authority on this account, including the authority to make deposits and withdrawals. This account was closed on February 18, 2002, before the date of the seizures in this case.

The second account, opened sometime in 2001, was in Mohammed Ghaleb's name. On January 14, 2002, the bank approved a

credit facility on this account, allowing for the deposit of U.S. dollar instruments to the account without prior bank approval. Samir and Talal were both guarantors on this credit facility, jointly liable with Mohammed Ghaleb for paying any deposited items that were returned. Shortly before the account in Samir's name was closed, all or nearly all of the funds in that account were transferred to the Mohammed Ghaleb account. The parties agree that most of the checks were deposited into the Samir account, rather than the Mohammed Ghaleb account, but they dispute the precise division between the two accounts.

On and just after the date of the first seizure, Samir did not have any account at Union Bank (Jordan) in his name, nor did he have deposit authority on the Mohammed Ghaleb account. On the dates of the seizures, Talal had at least one account at the bank, but none of the checks had been deposited into Talal's accounts. As of the dates of the seizures, the amount seized was more than the total funds in Mohammed Ghaleb's accounts alone, but less than the total funds in Mohammed Ghaleb's and Talal's accounts combined.

Once the checks were deposited with Union Bank (Jordan), the bank transmitted the checks to its U.S. interbank accounts to obtain payment on the checks; the checks were primarily, but not exclusively, transmitted to its account at the Bank of New York. The Bank of New York then presented the checks to the issuing banks

for payment, giving Union Bank (Jordan) a provisional credit on its interbank account in the interim. If an item had been properly returned by the issuing bank, the Bank of New York would have then debited the Union Bank (Jordan) interbank account and forwarded the returned item to Union Bank (Jordan), to allow it to collect on the item from the Esseilehs. In this case, none of the issuing banks sought to reverse payment, and the applicable statutory and regulatory time periods for seeking such a reversal expired; as a result, the credit on the Union Bank (Jordan) interbank account became final.

Had any items been returned to Union Bank (Jordan), the bank could have sought recourse from the Esseilehs based on their customer agreements and the guarantee signed by Samir and Talal. Those agreements provided that the Esseilehs would be responsible for "all liabilities which may result from depositing cheques in foreign currency . . . in case such cheques are proved to be invalid, counterfeited or unacceptable for cashing due to any reason whatsoever." The bank's position is that neither these customer agreements nor general banking law provide any basis for it to recover from the Esseilehs based on the seizures in this case.

Following the initial seizure, Union Bank (Jordan) transferred approximately $2.4 million from Mohammed Ghaleb's accounts into a restricted trust account. The bank has stated

under oath that it had no legal basis for this transfer. The Esseilehs sent to Union Bank (Jordan) a "notorial" warning that they would file suit to recover these funds, but following the bank's request to postpone any such suit pending the outcome of this case, the Esseilehs have not filed suit to date. The bank and the Esseilehs discussed the ability of the Esseilehs to file a claim in this case. The bank ultimately decided that it would be "stronger to do it alone," and the Esseilehs did not file a claim to challenge the forfeiture of the seized funds.

On February 6, 2003, Union Bank (Jordan) filed a claim in the in rem proceedings to the amounts initially seized from its interbank account, and on January 23, 2004, it filed a claim to the amounts subsequently seized. Following discovery, on July 1, 2004, both parties filed motions for summary judgment. The bank argued that it was an innocent owner of the funds, that the forfeiture of the funds would be an excessive fine under the Eighth Amendment, and that section 981(k) unconstitutionally treated foreign banks differently from American banks. The government argued that the bank was not an owner of the funds under section 981(k), and that as a result, the bank lacked both Article III standing and any right under section 981(k) to challenge the forfeiture.

On October 5, 2004, the district court denied the bank's motion for summary judgment on the merits of its innocent owner defense. In all other respects, both motions were denied without

prejudice. The court invited the bank to "renew its motion to the extent that it raises constitutional challenges and to the extent that it asserts that it is an 'owner' under the statute." Similarly, the government could renew its motion "as a cross motion to defendants' motions for summary judgment raising the same issue." The court further ordered that "[t]he parties shall each be limited to a single brief limited to 20 pages and the parties shall submit a joint statement of undisputed material facts in support of the motion." On November 22, 2004, the parties filed a joint statement of undisputed material facts and renewed cross-motions for summary judgment on the issue of ownership.

On January 6, 2005, the district court held an extended hearing on the summary judgment motions, at the conclusion of which it granted the government's motion and denied the bank's motion. The court held that the "obligation" referred to in section 981(k)(4)(B)(ii)(II) is the bank's obligation to repay funds on deposit, so that the bank's ownership status is measured against the "amounts that remain on deposit in the prior owner's . . . accounts" on the date of the seizure.[1] Furthermore, the court found that "the evidence demonstrates unequivocally that the

---

[1] The court first held that, contrary to the bank's argument, Union Bank (Jordan) was "the foreign financial institution" under 18 U.S.C. § 981(k)(4)(B)(i)(II) and hence was excluded by that provision from the definition of an "owner" unless one of the exceptions in 18 U.S.C. § 981(k)(4)(B)(ii) applied. Union Bank (Jordan) does not challenge this aspect of the ruling on appeal.

activities at issue here, the deposits of the checks into the [two] account[s], were the activities of a jointly conducted money-changing business operated by S[amir], M[ohammed Ghaleb], and Talal . . . ." Thus, amounts in the Mohammed Ghaleb account represented an "obligation" to the prior owners of funds deposited into either the Samir account or the Mohammed Ghaleb account. Because "[t]he bank ha[d] not presented [the court] with evidence suggesting that the [Mohammed Ghaleb] account [did] not contain enough money," the court found that the bank was not an owner of any of the seized funds, without considering whether to include funds in Talal's accounts as obligations under the statute.

On February 3, 2005, Union Bank (Jordan) filed a motion for reconsideration, presenting exchange rate information to show that the amount of the first seizure exceeded the balance in Mohammed Ghaleb's accounts on that day by at least $450,000, and also arguing that Talal's account should not be considered because it had "never [been] used for any money changing purposes." Union Bank (Jordan) also renewed its Eighth Amendment challenge.

On May 13, 2005, the district court held a second hearing, at which it granted the motion for reconsideration. The court held that the only obligations that needed to be discharged under 18 U.S.C. § 981(k)(4)(B)(ii)(II) in order for the bank to be an owner were those "that arise from the bank's receipt of forfeitable funds." Because there was "no evidence that there were

any transfers between the [Mohammed Ghaleb] account and Talal Esseileh's account," Talal's account was not an obligation that the bank had to discharge in order to be considered an owner. A factual dispute remained on whether an account used as security for the Mohammed Ghaleb account should be counted as "part of" that account, and hence part of the relevant obligation. That issue was set for trial, together with the merits of the bank's innocent owner defense. The court also rejected the bank's Eighth Amendment challenge, on the basis that the forfeitures at issue were entirely remedial.[2]

Thus, following these rulings, Union Bank (Jordan) was found not to be the owner of more than $2.1 million of the seized funds, with approximately $660,000 still in dispute. The parties then agreed to a settlement of the remaining issues, which provided for the forfeiture of approximately $280,000, the return of approximately $300,000 to Union Bank (Jordan), and a stipulation as to the remaining nearly $80,000 that its disposition would depend on whether the government successfully obtained on appeal a final decision that the bank was not the owner of these funds. The bank's appeal thus concerns the $2.1 million, while the government's cross-appeal relates to the $80,000.

---

[2] The court also rejected the bank's procedural due process claim, finding that the bank had failed to plead the claim in its answer and that the claim was without merit in any event. Union Bank (Jordan) does not raise this issue on appeal.

Meanwhile, on September 6, 2005, Reuven Krauzer filed a claim and motion to intervene, asserting an interest in the more than $2.1 million that the district court had held was not owned by the bank. Krauzer alleged that he had been forced to indemnify the Esseilehs after the bank had frozen $2.4 million from the Esseilehs' accounts, and that he had thereby succeeded to the Esseilehs' ownership interest in the seized funds. Earlier in the litigation, on March 17, 2003, Krauzer had filed claims to certain amounts seized from other banks' interbank accounts. Those claims had been settled, and the corresponding final order of forfeiture with respect to those claims had entered on December 27, 2004. Krauzer explained the delay in filing the September 2005 claim on the basis that it was dependent on the court's ruling that Union Bank (Jordan) was not the owner of the funds in question.

On October 18, 2005, the district court struck Krauzer's claim as untimely, finding the delay "inexcusable," the potential prejudice to the government "severe," and the disruption to the court's management of the proceedings significant. Subsequently, final orders of forfeiture entered in accordance with the district court's rulings and the settlement between the government and Union Bank (Jordan).

II.

In 2001, as part of the USA PATRIOT Act, Congress added a new provision to the federal civil forfeiture statute, 18 U.S.C.

§ 981(k), which established special rules for forfeitures from interbank accounts held by foreign banks at banks in the United States.[3] USA PATRIOT Act § 319(a), 115 Stat. at 311-12.

Interbank accounts, also known as correspondent accounts, are used by foreign banks to offer services to their customers in jurisdictions where the banks have no physical presence, and otherwise to facilitate transactions involving such jurisdictions. See generally Minority Staff of S. Permanent Subcomm. on Investigations, 107th Cong., Report on Correspondent Banking: A Gateway for Money Laundering 11-14 (Comm. Print 2001). Given the international importance of U.S. currency and the U.S. market, many foreign banks have such interbank accounts in the United States. Id. at 11-12. There are banks that conduct virtually all transactions external to the bank through their U.S. interbank accounts. Id. at 13.

Because interbank accounts can be used to complete transactions in the United States without the need to directly establish an account in the United States, they can be vehicles for money laundering, with or without the complicity of the foreign bank. Id. at 30. Before the 2001 enactment of section 981(k), it was difficult for the U.S. government to seek the forfeiture of

_____

[3] The statute defines an "interbank account" to be "an account held by one financial institution at another financial institution primarily for the purpose of facilitating customer transactions." 18 U.S.C. §§ 981(k)(4)(A), 984(c)(2)(B).

-16-

laundered funds in the interbank accounts of foreign banks. Id. at 41-42. This was because the bank, like any other account holder, was considered the owner of the funds in its interbank account, and hence the bank was entitled to assert an innocent owner defense to an attempted forfeiture. Id. In most cases, the bank was not criminally complicit in the underlying wrongdoing, and thus most such forfeitures would fail. See id.

Section 981(k) broadened the government's civil forfeiture power in two important ways. First, section 981(k)(1)(A) provides:

> For the purpose of a forfeiture under this section or under the Controlled Substances Act . . . , if funds are deposited into an account at a foreign financial institution . . . , and that foreign financial institution . . . has an interbank account in the United States with a covered financial institution . . . , the funds shall be deemed to have been deposited into the interbank account in the United States, and any restraining order, seizure warrant, or arrest warrant in rem regarding the funds may be served on the covered financial institution, and funds in the interbank account, up to the value of the funds deposited into the account at the foreign financial institution . . . , may be restrained, seized, or arrested.

Thus, it is the deposit of forfeitable funds into an account at a foreign bank, rather than the continued existence of forfeitable funds in that account, that triggers the forfeitability of an equivalent amount of funds in the foreign bank's interbank account.

-17-

The funds in the interbank account are forfeitable even if those funds have no connection to the forfeitable funds deposited in the foreign account. This is made clear by section 981(k)(2), which provides that in a forfeiture action under section 981(k)(1), "it shall not be necessary for the Government to establish that the funds are directly traceable to the funds that were deposited into the foreign financial institution . . . , nor shall it be necessary for the Government to rely on the application of section 984."[4] The net effect is to "treat[] a deposit made into an account in a foreign bank that has a correspondent account at a U.S. bank as if the deposit had been made into the U.S. bank directly." H.R. Rep. No. 107-250(I), at 58 (2001).

The provisions just described expand the reach of the forfeiture statute, but would not prevent the foreign bank from asserting an innocent owner defense. The statute further provides that "the owner of the funds deposited into the account at the foreign financial institution . . . may contest the forfeiture." 18 U.S.C. § 981(k)(3). "Owner" is, however, defined as follows:

> (B) Owner.
>
> (i) In general. Except as provided in clause (ii), the term "owner"--

---

[4] Section 984 provides for the forfeiture of "any identical property found in the same place or account as," inter alia, forfeitable "funds deposited in an account in a financial institution," 18 U.S.C. § 984(a), so long as the forfeiture action is commenced within one year of the underlying offense, id. § 984(b).

-18-

> (I) means the person who was the owner, as that term is defined in section 983(d)(6), of the funds that were deposited into the foreign financial institution . . . at the time such funds were deposited; and
>
> (II) does not include either the foreign financial institution . . . or any financial institution acting as an intermediary in the transfer of the funds into the interbank account.

Id. § 981(k)(4)(B). Thus, the general rule is that the foreign depositor, and not the foreign bank, is deemed the owner of funds seized under section 981(k), with the right to challenge the forfeiture and assert an innocent owner or other defense.

The statute provides two exceptions to the rule that the foreign bank is not an owner of the seized funds:

> (ii) Exception. The foreign financial institution . . . may be considered the "owner" of the funds (and no other person shall qualify as the owner of such funds) only if--
>
> (I) the basis for the forfeiture action is wrongdoing committed by the foreign financial institution . . . ; or
>
> (II) the foreign financial institution . . . establishes, by a preponderance of the evidence, that prior to the restraint, seizure, or arrest of the funds, the foreign financial institution . . . had discharged all or part of its obligation to the prior owner of the funds, in which case the foreign financial institution . . . shall be deemed the owner of the funds to the extent of such discharged obligation.

Id. § 981(k)(4)(B)(ii). It is the exception in subsection 981(k)(4)(B)(ii)(II) that we must construe here.

-19-

III.

We turn now to the central issue on appeal: whether Union Bank (Jordan) fits within the second exception to the general rule, such that it is the "owner" under section 981(k)(4)(B)(ii)(II) of some or all of the funds seized from its interbank account. We review the district court's rulings on summary judgment de novo. United States v. One Parcel of Real Prop., 960 F.2d 200, 204 (1st Cir. 1992). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). We draw all reasonable inferences in favor of the nonmoving party, but where that party bears the burden of proof, it "must present definite, competent evidence" from which a reasonable jury could find in its favor. One Parcel of Real Prop., 960 F.2d at 204.

Under section 981(k)(1)(A), once the cashier's checks in this case were deposited into accounts at Union Bank (Jordan), those checks were "deemed to have been deposited into the interbank account" of Union Bank (Jordan) in the United States, and the government then could and did seize an equivalent amount of funds from that interbank account. Because the checks were "deemed" deposited into the interbank account, funds from that account were forfeitable regardless of any subsequent fluctuations in the Samir

-20-

and Mohammed Ghaleb accounts, into which the checks were actually deposited.  Union Bank (Jordan) does not challenge this aspect of the statute on appeal; rather, the question is whether subsequent fluctuations in the Samir and Mohammed Ghaleb accounts affected who is to be considered the owner of the seized funds.

It is clear that Union Bank (Jordan) is "the foreign financial institution" excluded under section 981(k)(4)(B)(i)(II) as a general rule from ownership of the seized funds.  Instead, absent an exception, section 981(k)(4)(B)(i)(I) places ownership in the hands of the "owner . . . of the funds that were deposited into [Union Bank (Jordan)] at the time such funds were deposited." "Owner" is in turn defined by reference to section 983(d)(6), the provision that defines ownership for purposes of determining who can raise an innocent owner defense outside of the interbank context.  This cross-reference makes clear that, for the purpose of determining ownership, Congress intended to simply treat the foreign deposit as a domestic one.

Thus, putting aside the exception for the moment, ownership of the deposit is determined as if the transaction were wholly domestic.  Section 983(d)(6)(A) defines "owner" to be "a person with an ownership interest in the specific property sought to be forfeited, including a leasehold, lien, mortgage, recorded security interest, or valid assignment of an ownership interest." Under a prior incarnation of an innocent owner defense, we noted

-21-

Congress's instruction that, absent contrary statutory language, "the term 'owner' should be broadly interpreted to include any person with a recognizable legal or equitable interest in the property seized." United States v. 221 Dana Ave., 261 F.3d 65, 71 n.5 (1st Cir. 2001) (quoting Joint Explanatory Statement of Titles II and III, Pub. L. No. 95-633, 95th Cong., 2d Sess. (Oct. 7, 1978), reprinted in 1978 U.S.C.C.A.N. 9496, 9518, 9522) (internal quotation marks omitted). There is no indication that Congress intended to narrow that definition when it established a statutory definition of "owner" in section 983(d), as part of the Civil Asset Forfeiture Reform Act of 2000, Pub. L. No. 106-185, 114 Stat. 202, 206-07.

Under this definition, the Esseilehs were the owners of the checks at the time the checks were deposited into the Union Bank (Jordan) accounts. The district court found, and we agree, that on the state of the evidence, any reasonable fact-finder would be compelled to find that the Esseilehs' money-changing business was a joint venture or partnership among them and that the cashier's checks at issue had been acquired and deposited in the normal course of that business. Thus, the checks were property of the joint venture, and the Esseilehs, as joint venturers, were owners of the funds at the time they were deposited, regardless of which account the funds were deposited into. Cf. United States v. U.S. Currency, $81,000.00, 189 F.3d 28, 35-36 (1st Cir. 1999)

(finding that the name on a bank account is not conclusive of ownership).

The question then becomes whether Union Bank (Jordan) "had discharged all or part of its obligation to" the Esseilehs, so as to become the owner of the seized funds under the exception to the general rule at section 981(k)(4)(B)(ii)(II). The statute does not define the term "obligation." Nevertheless, in the context of bank deposits, the meaning of the term is clear. A deposit of a certain amount into a bank account creates a corresponding obligation on the part of the bank to repay that amount on demand. See Villafane-Neriz v. FDIC, 20 F.3d 35, 39 (1st Cir. 1994) ("[B]ank deposits . . . represent obligations on the part of a bank to repay funds to depositors."). Such an obligation is discharged by repaying the appropriate amount. Thus, a bank's obligation to a depositor is measured by that depositor's account balances. In this case, it is undisputed that on the dates of the seizures, the Esseilehs together had funds on deposit exceeding the amount of the seizures.[5] Because the Esseilehs, including Talal, were the prior owners of the funds, Union Bank (Jordan) does not fit within the exception because it had not discharged its obligation to the prior

---

[5] Union Bank (Jordan) has not argued that Talal's account was properly excluded because it contained funds that, as a matter of partnership law, were not assets of the partnership. Any such argument has thus been waived. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

-23-

owners, and it is thus not an owner of any portion of the seized funds.

Union Bank (Jordan) disputes this interpretation of "obligation," arguing that the term should be read more narrowly. While the district court rejected the bank's interpretation, it adopted a different interpretation also narrower than the one we have described. Neither of these two narrower interpretations is consistent with the language of the statute or its purpose, as reflected in the legislative history.

The primary argument of Union Bank (Jordan) is that the bank's "obligation" should be tied to its ability to obtain recourse for the seizure from its depositor, through setoff or otherwise. The bank then argues that because no recourse or setoff was possible in this case, it discharged its obligations and should be deemed the owner of the seized funds. This definition of "obligation" is said to stem both from the statutory language and from a purported congressional intent to equalize in all respects the treatment of foreign and domestic banks. Neither claim is correct.

Far from being supported by the statutory language, the bank's interpretation is entirely unmoored from that language. Recourse available to the bank is hardly an "obligation"; it is in the nature of a legal right or a contingency on an obligation. If a bank is left without recourse, then its obligation remains in

full force, rather than being discharged.  Nothing in the language of the statute ties the definition of "obligation" to the foreign bank's rights of recourse or setoff.

Indeed, the provision in section 981(k)(1)(B) strongly indicates that Congress did not intend to tie the bank's lack of ownership over the funds to its recourse rights.  Section 981(k)(1)(B) provides that the Attorney General

> may suspend or terminate a forfeiture under this section if the Attorney General determines that a conflict of law exists between the laws of the jurisdiction in which the foreign financial institution . . . is located and the laws of the United States with respect to liabilities arising from the restraint, seizure, or arrest of such funds, and that such suspension or termination would be in the interest of justice and would not harm the national interests of the United States.

If, as Union Bank (Jordan) asserts, the foreign bank were always able to assert ownership over any funds it could not recover from its depositors, section 981(k)(1)(B) would not have been necessary. Moreover, as section 981(k)(1)(B) recognizes, the contours of the foreign bank's rights may well be governed by foreign law and may well vary significantly from jurisdiction to jurisdiction.  There is every reason to think that Congress intended to avoid such complexities in a statute meant to make forfeiture more efficient and more available.  See H.R. Rep. No. 107-250(I), at 57-58.

As to the argument that Congress intended to equalize the treatment of foreign and domestic banks, any such intent appears to

have had more to do with subjecting foreign deposits to forfeiture as if they were domestic deposits than with protecting foreign banks from liabilities not faced by domestic banks. See 147 Cong. Rec. S10547, at S10581 (2001) (statement of Sen. Levin) (describing the foreign bank's lack of wrongdoing as "a strange reason for letting the foreign depositor who was engaged in a wrongdoing escape forfeiture"). Furthermore, the legislative history indicates that the intent of the added money laundering provisions was not only to "close the loopholes in existing law," but also to "provide additional tools for law enforcement to use." Id. at S10580.

In the context of this case, the bank tries to further narrow the term "obligation" by arguing that its obligation arose under the cashier's checks and that any obligation was discharged when the payment of those checks became final. But defining the bank's "obligation" in terms of an obligation under a cashier's check would tie the statutory language to the use of checks in this case, and there is no indication, either elsewhere in the statute or in the legislative history, that Congress intended ownership to turn on whether cash or checks were deposited. In any event, the argument is backwards. The primary obligation under a cashier's check is an obligation on the part of the issuing bank to pay a properly endorsed check. See United States v. Boren, 278 F.3d 911, 916 & n.4 (9th Cir. 2002). Such an obligation was one owed to

Union Bank (Jordan), at least while it was the holder of the check; it was not an obligation owed by Union Bank (Jordan).

Union Bank (Jordan) relies heavily on the policy argument that absent some ability on the part of the foreign bank to collect from the foreign depositor, that depositor will have lost nothing in the forfeiture and hence will have no incentive to appear in the forfeiture proceeding, thus thwarting the expressed purpose of Congress in crafting the ownership provisions. Whether or not the bank is correct that it lacks recourse or setoff rights in this case, it has not explained why, as a general matter, banks are not in a position to protect themselves by contract or other means, so as to give the foreign depositor the appropriate incentive to appear.[6] Cf. Landers v. Heritage Bank, 374 S.E.2d 353, 355 (Ga. Ct. App. 1988) (considering whether a bank customer's "signature card [was] effective" to permit the bank to debit the customer's account based on a debit to the bank's own account); cf. also Freese v. Regions Bank, N.A., No. A06A2154, 2007 Ga. App. LEXIS 398, at *8 (Ga. Ct. App. Mar. 30, 2007) (noting as a general principle that "[t]he UCC permits parties to a contract of deposit

_____

[6] In fact, the Esseilehs signed customer and guarantee agreements with Union Bank (Jordan) in which they agreed to hold the bank harmless from "all liabilities which may result from depositing cheques in foreign currency . . . in case such cheques are proved to be invalid, counterfeited or unacceptable for cashing due to any reason whatsoever." We express no view on whether this language would provide a basis for Union Bank (Jordan) to recover from the Esseilehs following the forfeiture in this case.

to agree between themselves as to their duties and the legal consequences which flow therefrom"). By imposing the loss on the bank as intermediary between the government and the foreign depositor, as the statute does, the bank has an incentive to explore all available options for passing on the loss and thereby forcing foreign depositors such as the Esseilehs into U.S. courts where they will be subject to discovery. Otherwise, the foreign bank would have every incentive, as Union Bank (Jordan) has done here, to step into its customers' shoes as claimants in the forfeiture proceeding, exactly the result Congress wanted to avoid.

As a fall-back position, Union Bank (Jordan) argued to the district court that its obligations were limited to those arising from the account into which particular funds were deposited. Since most of the checks were deposited into the Samir account, which was closed before the first seizure, the bank argued that it was the owner of at least those funds. The district court rejected such an account-based limitation, finding the money in different accounts potentially "fungible."

The court did, however, adopt a different limitation that it had fashioned, holding that the only relevant obligations were those "that arise from the bank's receipt of forfeitable funds." The court explained that the government would have had to provide evidence of "transfers between the [Mohammed Ghaleb] account and Talal Esseileh's account" in order to have included obligations

under Talal's account.  Union Bank (Jordan) pursues both its original theory and that of the district court on appeal.

The flaw with these theories is that they are premised on a conception of section 981(k) as reaching through the foreign bank to seize amounts in particular <u>accounts</u>, whereas the language and structure of the statute indicate that Congress intended to use the ownership provisions to reach through the bank to particular <u>depositors</u>.  The obligation at issue in section 981(k) is the bank's "obligation to the prior owner of the funds," 18 U.S.C. § 981(k)(4)(B)(ii)(II), not the obligation under a specific account or the obligation "arising" from the deposit of forfeitable funds. Congress could have added language limiting the relevant obligations, but it did not do so.[7]

Indeed, had Congress intended to limit forfeitures under section 981(k) to amounts corresponding to the balance in particular accounts, section 981(k)(1)(A) would have been the natural place to do so.  But as we have noted, the "deeming" language in that section makes the deposit of forfeitable funds in the foreign account, not the continued presence of funds in that account, the trigger for a forfeiture from the interbank account. There would have been no reason to craft such language if Congress

---

[7] In other contexts, where Congress has sought to limit the relevant obligations, it has used specific language to that effect. <u>See, e.g.</u>, 7 U.S.C. § 1929a(a) (creating a fund "for the discharge of the obligations of the Secretary [of Agriculture] under [certain] contracts").

had intended to limit forfeitures to the amounts in particular accounts. Union Bank (Jordan) is correct that, as a formal matter, its argument relates only to the ownership provision in section 981(k)(4)(B) and not the forfeiture provision in section 981(k)(1)(A). One of the key purposes of Congress in enacting section 981(k), however, was to expand the ultimate reach of the civil forfeiture statute by eliminating the foreign bank's ability to assert an innocent owner defense in most cases. See H.R. Rep. No. 107-250(I), at 57-58. Since Congress was keenly aware that granting ownership to the foreign bank would often defeat forfeiture, we cannot believe that Congress would have intended the ownership provision to implicitly incorporate an account-based limitation, when the forfeiture provision carefully avoids such a limitation.

There appears to be no legislative history directly addressing the meaning of the term "obligation" in section 981(k)(4)(B)(ii)(II). Statements in the legislative history, however, do support our view that ownership is to be measured in terms of the bank's relationship to its depositor, and not in terms of its relationship to particular accounts. The House committee report notes that section 981(k) would "treat[] the deposit in the correspondent account as a debt owed directly to the depositor, and not as a debt owed to the respondent bank." Id. at 58. In describing the effect of the ownership-shifting provision, no

mention is made of the foreign account.  Id.  Instead, the focus is on the debt represented by the amount in the interbank account. The ownership provisions create the fiction that this debt is owed to the foreign depositor.  The statutory exception at section 981(k)(4)(B)(ii)(II) ensures that this debt corresponds to a real debt owed by the foreign bank to the foreign depositor.  For those purposes, it does not matter in which account that debt is located.

The district court expressed discomfort with the result we reach, finding that it would effectively expose foreign deposits to forfeiture that would not have been exposed had they been domestic deposits.  That is the unequivocal result of the "deeming" language in section 981(k)(1)(A), however.  The district court relied on the fact that under section 984(a)(2), in a domestic forfeiture, only amounts in the "same place or account" as the forfeitable funds are themselves subject to forfeiture.  Section 981(k)(1)(A) contains no such limitation, nor does section 981(k) reference the application of section 984, except to disclaim it. See 18 U.S.C. § 981(k)(2) ("[N]or shall it be necessary for the Government to rely on the application of section 984.").  Thus, whatever disparity exists between foreign deposits and domestic deposits under section 981(k) has been created by section 981(k)(1)(A).  As we have already described, we do not believe Congress would have intended to use the ownership provisions in section 981(k)(4)(B) to alter this result.

-31-

Lastly, both the district court and Union Bank (Jordan) invoke the canon of construction that forfeitures are to be narrowly construed in support of their different limiting interpretations of the term "obligation."  To begin with, such a canon only has application in resolving ambiguities, and, as we have described, the language at issue here cannot support the interpretations of the district court and Union Bank (Jordan).  See Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 491 n.10 (1985) ("The strict-construction principle is merely a guide to statutory interpretation.  Like its identical twin, the 'rule of lenity,' it 'only serves as an aid for resolving an ambiguity; it is not to be used to beget one.'" (quoting Callanan v. United States, 364 U.S. 587, 596 (1961))).

Moreover, it is not clear the canon would cut in favor of a narrow interpretation of "obligation."  If the bank is deemed the owner of some part of the funds, "no other person shall qualify as the owner of such funds."  18 U.S.C. § 981(k)(4)(B)(ii).  Thus, to allow the bank's claim for ownership as to certain funds is to deny ownership to all other claimants to the same funds.  As a result, when multiple claimants are involved, the interpretation of "obligation" that we find compelled by the statute actually works to promote the broadest set of claimants.

Because we find that the district court unduly limited the obligations that the bank must discharge in order to claim

ownership, we reverse the district court's holding that Union Bank (Jordan) was the owner of some portion of the seized funds and hold that Union Bank (Jordan) was not the owner under the statute of any of the funds. As such, Union Bank (Jordan) does not have the statutory right to assert an innocent owner defense to the forfeiture.

IV.

We turn next to the claim of Union Bank (Jordan) that the forfeiture in this case is an excessive fine under the Eighth Amendment. At the outset, the government appears to have challenged the district court's jurisdiction to entertain this claim, and hence our jurisdiction, arguing that Union Bank (Jordan) lacks Article III standing. An issue of Article III standing is one that we must resolve before proceeding to the merits. Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94 (1998).

Here, it is clear that regardless of whether Union Bank (Jordan) is an "owner" under section 981(k), it has Article III standing to challenge the forfeiture. To have constitutional standing, a claimant generally need only show "any colorable claim on the defendant property," a requirement that we have characterized as "very forgiving." United States v. One-Sixth Share of James J. Bulger in All Present & Future Proceeds of Mass Millions Lottery Ticket No. M246233, 326 F.3d 36, 41 (1st Cir. 2003). The funds seized in this case were taken from the bank

account of Union Bank (Jordan), an account over which it exercised full dominion and control. This suffices to establish Article III standing. See U.S. Currency, $81,000.00, 189 F.3d at 39. That Union Bank (Jordan) is not a statutory "owner" of the funds does not, and cannot, alter its Article III standing. See United States v. One Lincoln Navigator 1998, 328 F.3d 1011, 1014 (8th Cir. 2003).

Nevertheless, prudential concerns limit the bank's ability to raise an Eighth Amendment challenge to the forfeiture of funds of which it is not a statutory owner. Prudential standing doctrine encompasses, among other principles, "the general prohibition on a litigant's raising another person's legal rights." Allen v. Wright, 468 U.S. 737, 751 (1984). Thus, to the extent that the bank is claiming that the forfeiture in this case is an excessive fine against the Esseilehs, or other statutory owners of the funds, the bank lacks prudential standing. Given Congress's goal in section 981(k) of bringing foreign depositors into forfeiture proceedings in lieu of foreign banks, there is no reason to allow foreign banks to assert the rights of those foreign depositors.

Union Bank (Jordan) does have standing to argue that the forfeiture is an excessive fine against the bank itself, but this argument fails on the merits. A forfeiture is limited by the Eighth Amendment only if it is punitive, at least in part. See Austin v. United States, 509 U.S. 602, 610 (1993). A forfeiture

under section 981(k), however, is not intended to punish the foreign bank at all, at least when the foreign bank is not a statutory owner.[8]  Indeed, the ownership provisions in section 981(k)(4)(B) were drafted as such precisely because the foreign bank would often be innocent and Congress wanted to make this innocence irrelevant in most cases.  Cf. id. at 619 (finding that innocent owner defenses "serve to focus the [forfeiture] provisions on the culpability of the owner," thus making such provisions look more punitive).  Congress's evident intent was to use the foreign bank merely as an intermediary to reach the foreign depositor. Regardless of whether Union Bank (Jordan) might be left to bear the cost of the forfeiture in this case, the forfeiture does not treat the bank as an object of punishment, and hence the Eighth Amendment does not limit the government's ability to extract funds from the bank's interbank account in the first instance.[9]

V.

Union Bank (Jordan) also argues that the district court erred in requiring single, simultaneous cross-motions for summary judgment and a joint statement of undisputed material facts.  Our

_____

[8] We do not reach the issue of a foreign bank's ability to raise an Eighth Amendment challenge to the forfeiture of funds when the exception at section 981(k)(4)(B)(ii)(II) in fact applies and the bank is a statutory owner.

[9] Our resolution of the Eighth Amendment claim makes it unnecessary to rule on the government's contention that proceeds forfeitures such as this one are always wholly remedial.

-35-

review of such a case management order is for abuse of discretion.[10] See Vélez v. Awning Windows, Inc., 375 F.3d 35, 41 (1st Cir. 2004).

There was no abuse of discretion here. The district court required the filing of a joint statement of undisputed material facts and limited each side to a single brief, but nothing in the district court's orders can be read to have limited the parties to referencing only undisputed facts. The district court's orders simply required the parties to place on the record the facts to which they could agree. The orders did not remove from consideration those facts that were still disputed, and they certainly did not preclude Union Bank (Jordan) from arguing in its brief that genuine issues of material fact remained. As the district court noted at the hearing on reconsideration: "To suggest that [the court] would attempt to foreclose one of [the bank's] options for resisting summary judgment is absurd." The court found that "[n]o lawyer could reasonably [have] construe[d] anything [the court] said" to mean that the bank was "prevented from raising disputed factual issues."

---

[10] Union Bank (Jordan) argues that our review should be de novo because its claim is that the district court misapplied the summary judgment standard. The bank does not, however, appear to take issue with how the district court applied the summary judgment standard to the evidence before it, but rather claims that it was denied an opportunity to supplement that evidence. This latter claim raises a case management issue, not an issue of the summary judgment standard.

In any event, if the bank in fact believed that the district court's orders were preventing it from meeting its burden on summary judgment, it was the bank's responsibility to contemporaneously object or seek clarification. Had the bank done so, the district court would have had the opportunity to correct any misunderstandings and to adjust the procedure as appropriate. Raising the issue on reconsideration, after the district court's opportunity to address the situation had passed, was too late. See CMM Cable Rep, Inc. v. Ocean Coast Props., Inc., 97 F.3d 1504, 1526 (1st Cir. 1996).

VI.

Finally, we address Krauzer's claim that the district court erred in striking his September 2005 claim as untimely. Our review is for abuse of discretion. United States v. One Dairy Farm, 918 F.2d 310, 311 (1st Cir. 1990).

Krauzer admits that his September 2005 claim was untimely,[11] but he argues that the district court should have permitted the claim as an equitable matter because the untimeliness

---

[11] The relevant deadline in this case required claims to be filed "not later than 30 days after the date of service of the Government's complaint." 18 U.S.C. § 983(a)(4)(A); see also Supp. R. Certain Adm. & Mar. Cl. C(6)(a)(i). The initial complaint was served on Krauzer on January 3, 2003, and the amended complaint on or about February 3, 2003. The district court granted a brief extension and gave Krauzer until March 17, 2003 to file his claims.

of the claim was the result of "excusable neglect."[12]  See <u>Pioneer</u>
<u>Inv. Servs. Co.</u> v. <u>Brunswick Assocs. Ltd. P'ship</u>, 507 U.S. 380, 383
(1993).  In <u>Pioneer</u>, the Supreme Court articulated a list of
factors relevant to determining whether a party proffering an
untimely submission has made a showing of excusable neglect.  These
factors include "the danger of prejudice to the [opposing party],
the length of the delay and its potential impact on judicial
proceedings, the reason for the delay, including whether it was
within the reasonable control of the movant, and whether the movant
acted in good faith."  <u>Id.</u> at 395.  Krauzer cites the same factors
in defense of his claim.

A consideration of the <u>Pioneer</u> factors, however, clearly
demonstrates that the district court did not abuse its discretion
in rejecting Krauzer's claim of excusable neglect.  Importantly,
Krauzer offers no valid excuse for the late filing of his claim.
Krauzer argues that because the bank filed a claim to these funds,
he should have been excused from filing a competing claim until
after the district court had rejected the bank's claim.  This is
simply not true.  The deadline for filing a claim in a forfeiture
proceeding exists precisely to force all claims, competing or not,

---

[12] Krauzer briefly asserts that his claim on appeal also has
a due process dimension.  Even if such an issue has been preserved,
Krauzer's invocation of due process adds nothing on these facts, as
he does not challenge the notice he was given, nor does he argue
that he was denied any opportunity other than the opportunity to
present an untimely claim.  <u>Cf.</u> <u>United States</u> v. <u>One Star Class</u>
<u>Sloop Sailboat</u>, 458 F.3d 16, 22 (1st Cir. 2006).

to be made known at the outset of the proceeding.  This procedure not only permits, but requires, the filing of competing claims, in the interest of judicial economy.  See Ortiz-Cameron v. DEA, 139 F.3d 4, 6 (1st Cir. 1998).

Despite Krauzer's argument to the contrary, it makes no difference that this case involved a novel issue of statutory interpretation.  Krauzer cannot reasonably argue that his claim was based on an interpretation of the statute that caught him by surprise.  The interpretation that led to the denial of the bank's claim was precisely the interpretation that the government had been proposing from the beginning.  Krauzer's argument in this regard boils down to the assertion that he assumed the bank would win.  It was not reasonable to forgo filing a competing claim on the basis of such an assumption.  Cf. United States v. 22 Santa Barbara Drive, 264 F.3d 860, 870 (9th Cir. 2001) ("Just because [the claimants'] claims were not obviously winning ones does not excuse their failure to file in a timely fashion.").

Krauzer does not suggest that inadvertence explains his failure to file a timely claim to the amounts seized from the interbank account of Union Bank (Jordan).  Any such suggestion is undermined in any event by his having filed claims to amounts seized from other banks' interbank accounts.  Thus, Krauzer appears to have made a tactical decision to forgo the filing of a claim, just as the Esseilehs appear to have made a tactical decision to

forgo filing their claim. Krauzer offers no reason not to hold him to his decision.

Moreover, allowing Krauzer's late claim, filed almost two and a half years after the deadline, would have resulted in prejudice to the government and disruption of the judicial proceedings. Both the government and the district court were entitled to know at the outset what competing claims would be made to the seized funds. The government may well have made different litigation and settlement choices had Krauzer filed his claim alongside that of the bank. And the district court could have structured its case management orders and rulings to resolve the parties' competing claims of ownership simultaneously.

In addition, Krauzer's claim depends on his assertions about his indemnification of the Esseilehs. These assertions were never explored in discovery because they were neither relevant to Krauzer's earlier claim nor relevant to the claim of Union Bank (Jordan). The potential need to reopen discovery would also prejudice the government and disrupt the proceedings. Given the significant costs of permitting Krauzer's claim, together with the lack of an excuse for its untimeliness, we hold that the district court did not abuse its discretion in striking the claim.

VII.

The judgment of the district court finding that Union Bank (Jordan) was the owner of some portion of the seized funds is

reversed.  In all other respects, the judgment of the district court is <u>affirmed</u>.  The case is <u>remanded</u> for further proceedings consistent with this opinion.  Costs on appeal are awarded to the United States.